434 So.2d 96 (1982)
Jewel Rockenfield WHITLEY and David C. Whitley
v.
TEXACO, INC.,
Consolidated with Charles VUILLEMOT, Jr., et al.
v.
TEXACO, INC.
Nos. 5-228, 5-229.
Court of Appeal of Louisiana, Fifth Circuit.
December 9, 1982.
On Rehearing March 8, 1983.
Writ Denied May 23, 1983.
*99 Duval, Funderburk, Sundbery & Lovell, Karl E. Lewis, Jr., Houma, for plaintiffs-appellees.
Chaffe, McCall, Phillips, Toler & Sarpy, C. Manly Horton, Jr., Wiley G. Lastrapes, Jr., New Orleans, for defendant-appellant.
Before CHEHARDY, KLIEBERT and CURRAULT, JJ.
CHEHARDY, Judge.
These consolidated cases involve petitory actions by two sets of plaintiffs, the Whitleys and the Vuillemots, against a single defendant, Texaco, Inc. The trial judge ruled that plaintiffs had established good title and good faith possession of the property. Further, he found that defendant's title was invalid and that defendant had neither 10 years' good faith possession nor bad faith possession of the land. In contrast, we find plaintiffs failed to prove they acquired ownership, either from a previous owner or by acquisitive prescription. We also find defendant established a valid title to the land. Accordingly, we reverse and set aside the judgment of the district court and render judgment in Texaco's favor for the reasons set forth below.
The land in dispute is located in Section 46 of Township 14 South, Range 20 East, St. Charles Parish, Louisiana. It is described by the plaintiffs as part of Lots 45 and 47 of the Coteau de France subdivision, specifically those portions of the lots lying southeast of U.S. Highway 90, each tract measuring 192 feet front by a depth of 500 feet. The defendant describes the disputed area as being portions of Lots 180, 191, 192 and 193 of the Sunset Drainage District, Sub-District No. 1, St. Charles Parish. Despite these varying descriptions, there is no question all parties are referring to the same area of land.
The Whitleys allege they have record title to Lot 47; the Vuillemots claim record title to Lot 45. Texaco asserts record title to the entire area. In the alternative, all parties assert ownership through acquisitive prescription of 10 and 30 years.
Lots 45 and 47 are next to each other; Lot 47 lies north of Lot 45. The northwestern boundary of both lots admittedly begins at a public road which parallels the Southern Pacific Railroad right-of-way. The plaintiffs contend these lots extend across Highway 90 by approximately 500 feet, thus overlapping the property claimed by *100 defendant. In contrast, Texaco contends the southeastern boundaries of Lots 45 and 47 end a few feet within the northwestern right-of-way of the present Highway 90, at the southeastern boundary of Section 47 of T14S, R20E. The land claimed by all parties lies entirely within the boundary line of Section 46 of the township.
The plaintiffs attempt to deraign title from sovereignty into themselves. The defendant claims title to the disputed area by virtue of a tax sale from the Louisiana Land and Exploration Co., Inc., to Sunset Realty & Planting Company, Inc., in 1930. This tax sale encompassed a huge tract of land in the Sunset Drainage District of St. Charles Parish. The sale included Lots 180, 191, 192 and 193 of the Sunset Drainage District, Sub-District 1. As shown on the official map introduced into evidence, the disputed property is within those lots.
Texaco acquired this property through a chain of title from Sunset Realty & Planting Company, Inc. Texaco contends that the tax sale cannot be set aside now because of the five-year peremption period established by Article 7, Section 25 of the Louisiana Constitution of 1974, formerly Article 10, Section 11 of the Louisiana Constitution of 1921. In fact, the plaintiffs have not attacked the validity of the tax sale.

THE ACTION OF THE DISTRICT COURT
At trial the parties introduced voluminous documentary evidence to support their title claims and testimony of numerous witnesses to support their claims of possession. The district court rendered judgment in favor of both sets of plaintiffs, recognizing their ownership of the land in question.
In his judgment, the trial judge made the following statements:
"This Court finds as a matter of fact, that Texaco, Incorporated is unlawfully claiming ownership of the two above described tracts by virtue of certain acts of sale dated October 2, 1951, which the alleged owners at the time were incapable of passing valid title.
"This Court further finds as a matter of fact that the facts brought out through testimony, as well as the various chains of title do not support Texaco's allegation of bad faith possession and it goes without saying that this Court further finds likewise with respect to the allegation of ten years good faith possession."
Further, in his reasons for judgment, he said:
"Texaco, Incorporated has predicated a substantial portion of their case on actual possession of the land in dispute, admitting however that the enclosed portion is protected in part from trespassers by a canal. This Court has found, as a matter of fact, that the location of the canals does not correspond to any definite title description, nor do the boundary markers relied upon by the Defendant.
"By and large, the law cited by each party is correct. It is the facts of the case which prompt this Court's Judgment.
"This Court further finds, as a matter of fact, that Jewel Rockenfield Whitley and David Whitley have established good title to Lot 47, including the disputed area of the Coteau de France Subdivision, the most persuasive evidence being a survey dated August 19, 1946, intended to describe a land title by which Arleigh J. Nave acquired the land in question, from which the Plaintiffs acquired same by Act of Sale from Nave.
"With respect to Plaintiffs Vuillemot, James and Hale and Lot 45 of Coteau de France Subdivision, there is also shown a chain of title leading to Plaintiffs, with great weight given to the Bernard & Collier surveys which reflect the boundaries to Plaintiffs in Civil Action # 18,030.
"Regarding all Plaintiffs' claims, this Court finds, as a matter of fact, that they were possessors in good faith as described in the provisions of Art. 3451 of the Civil Code. [F]urther, they have benefit of the presumption under Art. 3481 of the Civil Code."
*101 Our review of the record convinces us this judgment was based either on a misinterpretation of the relevant law or on factual findings which are clearly wrong under the established jurisprudence. Accordingly, we reverse.

THE LAW ON PETITORY ACTIONS
LSA-C.C. art. 531, adopted in 1979, states, "One who claims the ownership of an immovable against another in possession must prove that he has acquired ownership from a previous owner or by acquisitive prescription. If neither party is in possession, he need only prove a better title." Art. 531 became effective January 1, 1980; this case was tried on June 11, 1980.
At the time this case was tried, LSA-C. C.P. art. 3653 provided:
"To obtain a judgment recognizing his ownership of the immovable property or real right, the plaintiff in a petitory action shall:
(1) Make out his title thereto, if the court finds that the defendant is in possession thereof; or
(2) Prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof."
That article was amended in 1981 to conform to the new Civil Code Articles 531 and 532. Thus, C.C.P. art. 3653 now reads:
"To obtain a judgment recognizing his ownership of immovable property or real right therein, the plaintiff in a petitory action shall:
(1) Prove that he has acquired ownership from a previous owner or by acquisitive prescription, if the court finds that the defendant is in possession thereof; or
(2) Prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof.
"When the titles of the parties are traced to a common author, he is presumed to be the previous owner."
These articles are the starting point in any petitory action. The threshold issue is whether the defendant is in possession of the property when the case is tried, for that determines the plaintiff's burden of proof.
In their petitions, the Whitleys and the Vuillemots alleged neither they nor the defendant were in possession of the disputed property. Texaco agreed that plaintiffs were not in possession, but alleged that it was in possession. The trial judge, while his reasons for judgment are ambiguous, appears to have determined Texaco was not in possession of the property because the boundary markers do not correspond to any definite title description. This determination was based on an apparent misunderstanding of the law.
It is not disputed that the land in question lies within a larger area owned by Texaco and surrounded by fences or canals. While these fences and canals may or may not correspond to the boundaries derived from Texaco's title, nonetheless the land at issue is within the larger enclosure thus created. Since 1968, Texaco has leased the land to Norman St. Amant, who uses it as a pasture to graze cattle and make hay. We conclude Texaco had constructive possession, through its lessee, of the area in question at the time suit was filed and at the time of trial. LSA-C.C. arts. 3437, 3438; LSA-C.C.P. art. 3660.[1]
*102 Consequently, the burden placed on plaintiffs was to prove they acquired ownership from a previous owner or by acquisitive prescription. Prior to enactment of C.C. art. 531, this burden had been described as a requirement "to show title good against the world without regard to the title of the party in possession." Pure Oil Company v. Skinner, 294 So.2d 797 (La. 1974); Montgomery v. Breaux, 297 So.2d 185 (La.1974). The plaintiff in a petitory action against a defendant in possession makes out his title when he proves his ownership either by an unbroken chain of valid transfers from the sovereign or an ancestor in title common with the defendant; acquisitive prescription of 10 or 30 years will suffice. Bishop Homes, Inc. v. Devall, 336 So.2d 313 (La.App. 1st Cir.1976), writ refused 338 So.2d 1155. The enactment of C.C. art. 531 and the amendment of C.C.P. art. 3653 has not changed the rule of Pure Oil Company v. Skinner, supra. Rather, the legislative intent was to clarify the meaning of the clause "to make out his title" formerly contained in C.C.P. art. 3653(1). Weaver v. Hailey, 416 So.2d 311 (La.App. 3d Cir.1982).

THE VALIDITY OF PLAINTIFFS' TITLES
Careful review of the plaintiffs' titles convinces us they cannot, on the evidence before us, show title good against the world. Both groups of plaintiffs attempt to trace their titles back, through a lengthy series of transfers and accompanying juridical acts, to one Andre Pizani whose land claim was confirmed by act of the United States Congress in 1835. Without going through each link in their chains of title, we point out the following apparent defects in the titles of the various purchasers of lands encompassing the subject tracts:
1. Andre Pizani was the sole original patentee of the land later surveyed by the United States and described as Section 46, T14S, R20E. Yet in an 1833 sale to Antoine Diez, Andre Pizani, Adelaide Pizani and Emelie Pizani were the vendors. There is no document to establish how Adelaide and Emelie Pizani acquired title, although the act does state, "[S]aid property was acquired by the present vendors by inheritance from their late Mother." Further, that act describes the land as being in Lafourche Parish rather than St. Charles Parish; the act was recorded initially in Lafourche Parish, and was not recorded in St. Charles Parish until 1940.
2. In 1827, Antoine Diez acquired the claims and titles of the widow of Pierre Domé and several other Domés, but there is no showing as to how the Domés acquired their titles.
3. An 1836 sale by the Succession of Antoine Diez to Ranson Freres, a partnership, was not recorded in the Conveyance Book of St. Charles Parish until 1939.
4. In the lawsuit of Ranson v. Long, 13 La.Ann. 523 (1858), a petitory action by Louis Ranson, the Supreme Court's judgment in favor of Ranson refers to the land in controversy in that case as having been confirmed more than 20 years previously to "Toup's heirs." Reference to the official township plat indicates the land shown as claimed by "The Children of Paul Toups" ran through Sections 37, 39, 41, 47 and 48 of the township, but not Section 46, in which the land in dispute here lies.
5. Adele Cole acquired Lot 45 in 1886 from Felix Roux. In that act of sale, as in the prior sale from J.A. Latorre to Felix Roux, Lot 45 was described as measuring one arpent in width along the railroad, by four and one-fourth arpents in depth. However, in the 1931 sale by Mrs. Cole of Lot 45 to Arleigh Nave, Jr., that lot is described as being eleven and one-half arpents in depth.
6. In the 1916 sale of Lot 47 by Adele Cole to Lillie Jackson and Louise Cole, the vendees purchased with the written consent of their husbands, Solomon Henderson and William Brown respectively. However, *103 there is no recitation that these ladies were purchasing for their separate estates, as was required at that time to avoid the presumption of community acquisition.
7. The 1931 judgment of possession in the Succession of Louise Cole describes Lot 45 as being a part of her estate, when it was actually Lot 47 she owned. The act also describes Lot 45 as being eleven and one-half arpents in depth. This error was not corrected until 1954, when an amended and supplemental judgment listing the correct lot number was filed. In the meantime, the property had changed hands three times, with the incorrect property description appearing in each sale. In addition, the amended and supplemental judgment states that Louise Cole acquired the property partly by inheritance from her husband William Brown. The record, however, contains no judgment naming Louise Cole as William Brown's heir.
8. In the 1931 sale of Lots 45 and 47 to Arleigh Nave, Jr., by Lilly Jackson, Adele Joissin (Yassin) Cole Jackson, and Ezekiel, James, and Rufus Cole, the act of sale does not clarify what interest, if any, Lilly Jackson's by-then-deceased husband, Solomon Henderson, had in the land. In addition, that act indicates Lilly Jackson was selling her interest in Lot 45, when actually she owned Lot 47. Similarly, because of the transposition of the lot numbers, the act confuses the respective interests of Louise Cole's heirs in the lots.
These apparent defects make plaintiffs' titles suggestive of litigation. As the record fails to explain these areas that cloud the titles, we conclude plaintiffs have failed to sustain their burden of proof as to good title. Rivet v. Dugas, 377 So.2d 489 (La. App. 4th Cir.1979).

ACQUISITIVE PRESCRIPTION
Accordingly, we now turn to the question whether plaintiffs proved ownership by acquisitive prescription.
LSA-C.C. art. 3474 provides, "Immovables are prescribed for by 10 years, when the possessor has been in good faith and held by a just title during that time."
LSA-C.C. art. 3479 establishes the conditions necessary for good faith prescription:
"To acquire the ownership of immovables by the species of prescription which forms the subject of the present paragraph, four conditions must concur:
1. Good faith on the part of the possessor.
2. A title which shall be legal, and sufficient to transfer the property.
3. Possession during the time required by law, which possession must be accompanied by the incidents hereafter required.
4. And finally an object which may be acquired by prescription."
The Civil Code requires the possession to be "continuous and uninterrupted, peaceable, public and unequivocal." LSA-C.C. art. 3487. "When a person has a title and possession conformably to it, he is presumed to possess according to the title and to the full extent of its limits." LSA-C.C. art. 3498. There is a rebuttable presumption of good faith in the possessor. LSA-C.C. art. 3481. As long as the possession commenced in good faith, a subsequent knowledge by the possessor resulting in bad faith does not prevent the prescription. LSA-C.C. art. 3482. Further, the possessor may tack on to his own possession that of his author in title. LSA-C.C. art. 3493.
LSA-C.C. arts. 3499 et seq. provide for prescriptive acquisition of immovables by 30 years without need of title or possession in good faith. This type of possession must be continuous and uninterrupted during the whole time, public, unequivocal and under the title of owner. The possession necessary, once acquired, may be preserved by external and public signs announcing the possessor's intention to preserve the possession. This type of prescription, however, extends only to that which has been actually possessed by the person pleading it.
One who holds a deed translative of title is presumed to possess to the full extent of his title by any act of possession *104 upon his land. Winjum v. Duplantis, 393 So.2d 405 (La.App. 1st Cir.1980). One who possesses property in good faith under a deed translative of ownership is considered to possess to the extent of his title, provided he has corporeally possessed part of the property described in the deed. In such a case, that person is considered to be in constructive possession of the entire tract. Pitre v. Tenneco Oil Company, 385 So.2d 840 (La.App. 1st Cir.1980), writ denied 392 So.2d 678.
Yet constructive possession by one party cannot defeat the adverse corporeal possession by another for a sufficient period of time to establish prescriptive title. Hanna v. Green, 329 So.2d 850 (La.App. 2d Cir.1976). Further, the rule that possession of a part of a tract of land under color of title is possession of the whole tract cannot prevail over the adverse possession of another party under better title. Smith v. Arkansas Fuel Oil Co., 219 La. 982, 54 So.2d 421 (1951).
Bearing in mind these principles governing prescriptive acquisition, we must examine the facts as to the acts of possession exercised by the parties over the disputed land. We seek to determine whether the plaintiffs acquired ownership by acquisitive prescription; if not, then whether Texaco's acts of possession were sufficient to give ownership to it.

ACTS OF POSSESSION BY THE PARTIES
There is no positive evidence as to possession by plaintiffs' ancestors in title, Adele Cole, et al., between the years 1919 and 1931. Accordingly, we begin with the possession exercised by Arleigh Nave, Jr., subsequent to his 1931 purchase of Lots 45 and 47.[2]
The testimony of plaintiffs' witnesses indicated that from the time Arleigh Nave, Jr., purchased the lots, the front portion was cultivated almost continuously, at least to 1943, by either Nave or various tenants and the Whitleys. After Ruby Nave Pflueger bought the lots in 1936, they were leased to a series of tenants, who lived on the property and farmed the cleared portion to the front of it. At times they grazed cattle on it.
The cleared area extended about one-third of the depth of the lots. (This calculation was based on the eleven and one-half arpents contained in plaintiffs' deeds.) From there on, the property was wooded. Plaintiffs considered their property extended the length of the woods, up to where the woods gave way to a cleared area known to them as the prairie. Most of the plaintiffs' witnesses testified there was evidence of an old barbed wire fence extending along the trees near the point where the prairie began. The plaintiffs apparently considered this deteriorated fence to mark their boundary. There was no testimony, however, of there being fences all along the sidelines of their lots, at least in the wooded area.
In addition, plaintiffs or their tenants occasionally hunted, picked berries and cut wood in the wooded portion of their property. The witnesses testified these activities extended the length of the property, and that they restricted the activities to the property assumed to belong to plaintiffs.
From the evidence, we deduce that the farming and cattle grazing by plaintiffs and/or their tenants took place in the front portion of the property, not in the now-disputed area. The hunting, wood-cutting and berry-picking apparently took place throughout the wooded area of the lots, including that portion of the wooded area that comprised the tract now in controversy.
In 1935 or so, the new Highway 90 was cut through, thus visibly separating the *105 now-disputed area from the front portion of the lots. Testimony of plaintiffs' witnesses tended to deny there was any fence along the Highway 90 right-of-way until the 1940's. Their testimony also indicated they were unaware of any adverse claim on the land until about 1946.
In 1946 the Whitleys and the Vuillemots had the portion of their lots southeast of the new Highway 90 surveyed and plans drawn up to subdivide it into lots for sale. They hired a contractor, who cut a roadbed down the center of the proposed subdivision. At this point they were contacted by a representative of the Sunset Realty & Planting Company, who advised them they were trespassing on Sunset's property. A barricade was erected across plaintiffs' road, but plaintiffs promptly removed it. A fence, with a locked gate in it, was then put up and plaintiffs thereafter desisted in further efforts to subdivide the area. Subsequently Sunset filed a possessory action against plaintiffs, which eventually was dismissed for abandonment.
Thereafter, plaintiffs subdivided and developed the front part of their lots, that lying between the railroad and the new Highway 90, and sold it off in lots. The last lot was sold in 1955 or 1956.
The evidence indicates that from 1946 to the present, possession of the area in question has been actively disputed. Plaintiffs' witnesses testified fences would be erected periodically along the Highway 90 right-of-way, and "No Trespassing" signs posted. Plaintiffs would then tear down the signs and destroy the fences. This happened several times. In 1962 plaintiffs erected a fence of their own around the disputed area, and posted signs, but the fence and signs had been removed within 90 to 120 days later. The plaintiffs did not attempt to erect another fence, but occasionally have removed the signs posted in the area and replaced them with their own signs only to find their signs later replaced by others.
Testimony by the defense witnesses indicated the property had been leased out continuously as pasture land since the late 1930's or early 1940's. Before that it was farmed. They also testified there had been a fence along the new Highway 90 right-of-way since 1936 or 1937; that the disputed area is contained within about 400 acres which for many years have been enclosed on all sides by fences or canals; that cattle have been kept in the pasture for grazing, and these cattle occasionally grazed in the woods. The lessees also made hay, and maintained the pasture and the fences.
None of the defense witnesses could recall their possession being disturbed, other than for the time when the plaintiffs attempted to put a road through the disputed property, and in 1972 when some "For Sale" signs were erected by a real estate agent on behalf of the plaintiffs. None of them were aware of the fence-and-sign-removal/replacement incidents related by plaintiffs. None of them could recall ever seeing any fence remnants at the edge of the woods. It appears defendants, like plaintiffs, were unaware of any adverse claim to the land until 1946.
Reviewing these facts, it is clear to us that 30-year prescription is inapplicable to this case. During the 50-year period for which we have positive evidence of possession by the parties or their ancestors in title (1930-1980), there was never a 30-year period in which either plaintiffs or the defendant had continuous and uninterrupted possession.
Similarly, from 1946 to the time of trial, no 10-year period of undisputed possession passed. The crucial time period for prescriptive purposes, thus, is between 1931, when Arleigh Nave, Jr., bought the land, and 1946, when the Whitleys' and Vuillemots' subdivision attempt was halted by Sunset Realty. During this time, both sides in this dispute had constructive possession of the property. The presumption of good faith applies equally to each; both had "just title" as defined in LSA-C.C. arts. 3483-3486; and both sides had corporeal possession, personally or through lessees, of a part of the area covered by their titles. See also Winjum v. Duplantis, supra; *106 Authement v. Theriot, 292 So.2d 319 (La. App. 1st Cir.1974). The testimony indicates that during this time, neither plaintiffs nor defendant were aware of the other's adverse claim.
However, since each had constructive possession, these constructive possessions offset each other. Thus, one side or the other must establish adverse corporeal possession for 10 years, between 1931-1946, to establish prescriptive title. Hanna v. Green, supra. The only evidence of any corporeal possessory acts by defendant on the actual disputed area during this time is that Sunset Realty put up a fence along the new Highway 90 in the late 1930's. The plaintiffs' only evidence of corporeal possession is of occasional hunting, wood-cutting and berry-picking which may have extended into the controverted tract.
We find none of the acts, under the evidence before us, was sufficient to constitute adequate adverse corporeal possession of the land for prescription. Accordingly, we conclude both sides have failed to prove they acquired ownership through prescription. Neither side ever exercised continuous, uninterrupted, peaceable and unequivocal possession of the disputed area long enough to acquire it through prescription, either for 10 years or for 30 years.
"Taken as a whole, the record reflects that both sides in this controversy have exercised acts of possession on the subject property for many years. We think it evident that neither party has ever exercised exclusive possession thereof for any extended period of time." Voisin v. Luke, 341 So.2d 6, 10 (La.App. 1st Cir. 1976), writ refused 342 So.2d 224.
See also Winjum v. Duplantis, supra.
THE VALIDITY OF TEXACO'S TITLE
As discussed above, Texaco holds title through Sunset Realty's 1930 tax title, on which the constitutional five-year peremptive period has run. Plaintiffs have not attacked this title, and we find it valid on its face. The only apparent way it could have been attacked is for lack of assessment due to inadequate description of the property in the tax deed. That description is cured, however, by reference to the official map of the Sunset Drainage District introduced into evidence by defendant. Lasseigne v. Clement, 311 So.2d 600 (La.App. 4th Cir.1975), writ refused 313 So.2d 846; Const.1974, Art. 7, Sec. 25; Const.1921, Art. 10, Sec. 11.

CONCLUSION
Both plaintiffs and defendant in this case had constructive possession of the land and exercised acts of possession adverse to the other side. Since each side's acts were offset by the other's, we conclude the party with the better title must prevail. Smith v. Arkansas Fuel Oil Co., supra. Texaco, having established valid title, is entitled therefore to be adjudged owner of the land. Although Texaco did not reconvene for this relief, we have authority to recognize its ownership under LSA-C.C.P. art. 862. Weaver v. Hailey, supra, Clayton v. Langston, 311 So.2d 74 (La.App. 3d Cir.1975).
For the reasons assigned, the judgment of the district court is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of defendant and against plaintiffs, dismissing plaintiffs' suits and recognizing Texaco, Inc., as owner of the following described property:
A certain piece of land situated in Section 46, Township 14 South, Range 20 East, St. Charles Parish, Louisiana, comprised of portions of Lots 180, 191, 192 and 193, said lots having locations and dimensions as shown on a map of the Sunset Drainage District of St. Charles Parish, prepared by James S. Webb, Civil Engineer, and John A. Kruse, Consulting Engineer, approved December 1, 1925, by A.V. Smith, President of the Board of Commissioners of Sunset Drainage District.
Said piece of land has sometimes also been referred to as part of the property known as the Coteau de France between Bayou Saut d'Ours and Bayou des Allemands in the Parish of St. Charles, Louisiana, as shown on a plat by L.J. Fremeaux *107 surveyed the 6th day of February, 1869, recorded with an act passed by E. Bouny, Notary, on the 26th day of March, 1886, from H. Lafon to Jean Alvarez Latorre, said property being all of Lots 45 and 47 located southeast of U.S. Highway 90, each said lot measuring 192 feet front by 500 feet in depth, as shown on a plat by E.M. Collier recorded in 1972.
All costs at both the trial and appellate levels are assessed against plaintiffs.
REVERSED, SET ASIDE AND RENDERED.

ON REHEARING
CHEHARDY, Judge.
We granted rehearing in this matter because the plaintiffs-appellees, who were the losing parties in the appeal, brought to our attention an old Louisiana Supreme Court case which appeared to conflict with one of our findings in our original opinion.
In our original opinion, we found that both sides in this dispute had constructive possession of the disputed tract, and therefore they were required to establish that one or the other had exercised sufficient adverse corporeal possession to establish prescriptive acquisition. We determined that neither side was able to prove adequate corporeal possession for acquisitive prescription. Defendant Texaco, however, established it had a valid title, and so we awarded ownership of the land to it.
In their application for rehearing, the plaintiffs cited the case of Gilmore v. Schenck, 115 La. 386, 39 So. 40 (La.1905), in which our Supreme Court stated:
"* * * [I]t is manifestly impossible that there should be two constructive possessions at one and the same time of the same property. The person first holding constructive possession of a particular property under a title maintains it as against later alleged constructive possession of the same property by another person. The possession of the latter is limited to the precise property of which he has actual possession. * * *" 39 So. at 44.
We granted a rehearing restricted to the issues of conflicting constructive possession and corporeal possession prior to 1946.
Plaintiffs-appellees argue that the testimony in the case establishes they had constructive possession before Texaco and/or its ancestors-in-title. Based on the Gilmore case, therefore, they contend they are entitled to judgment in their favor. In light of these arguments we have re-examined the evidence and the law carefully.
In the Gilmore case, the plaintiff had earlier title than the defendant. Gilmore took actual possession of a part of the land encompassed by his title, thus acquiring constructive possession of the rest. Eleven years later, Schenck bought from a third party part of the land over which Gilmore had constructive possession. Schenck immediately commenced lumbering operations, whereupon Gilmore filed suit against him. Both parties claimed possession under title, and that possession of a part entitled each to constructive possession of the whole. Because Gilmore's title as well as his constructive possession were earlier than Schenck's, the court ruled in plaintiff's favor.
A line of cases decided since Gilmore hold that constructive possession of part of a tract of land by reason of possession of the whole under color of title cannot prevail over the adverse possession of the other party under a better or earlier title, whether the latter's possession be civil or corporeal. Case v. Jeanerette Lumber & Shingle Co., 79 So.2d 650 at 652 (La.App. 1st Cir.1955), citing Smith v. Arkansas Fuel Oil Co., 219 La. 982, 54 So.2d 421 (La.1951), and Ernest Realty Co. v. Hunter Co., 189 La. 379, 179 So. 460 (La.1938). See also Chicago, St. L. & N.O. Ry. Co. v. Town of Amite City, 136 La. 742, 67 So. 814 (La. 1915); John T. Moore P. Co. v. Morgan's Louisiana & T.R. & S.S. Co., 126 La. 840, 53 So. 22 (La.1910), and cases cited therein.
Actual possession of part of the tract of land, with title to the whole, and intent to possess the whole, is possession of the whole; and when thus commenced, such *108 possession is continued by a mere civil possession unless ousted by a counter actual possession of one year. Hill v. Richey, 221 La. 402, 59 So.2d 434 (La.1952); Jones v. Goss, 115 La. 926, 40 So. 357 (La.1906); W.J. Gayle & Sons, Inc. v. Deperrodil, 300 So.2d 599 (La.App. 3d Cir.1974), writ denied 303 So.2d 186; Pitre v. Tenneco Oil Co., 385 So.2d 840 (La.App. 1st Cir.1980), writ denied 392 So.2d 678.
When a person has once acquired actual possession, his intention may serve to preserve the possession, though he may have ceased to have the thing in actual custody; and the intention is always supposed where a contrary intention does not appear. Miller v. Albert Hanson Lumber Co., 130 La. 662, 58 So. 502 (La.1912).
A possessor does not lose possession against his consent unless he is forcibly expelled or unless the disturber usurps possession and holds it for more than a year. Norton v. Addie, 337 So.2d 432 (La.1976); Liner v. Louisiana Land & Exploration Company, 319 So.2d 766 (La.1975); Plaisance v. Collins, 365 So.2d 608 (La.App. 1st Cir.1978).
Numerous disturbances may occur without interrupting possession of the land. Self v. Hutton, 395 So.2d 382 (La.App. 1st Cir. 1981). A disturbance in possession may or may not interrupt possession, depending on the nature of the disturbance; a disturbance may not deprive a person of his dominion and control over property if it merely interferes with his right to possession or throws an obstacle in the way of his enjoyment of possession. Plaisance v. Collins, supra; see also Pitre v. Tenneco Oil Co., supra.
In our original opinion we determined that Texaco's title was valid, whereas plaintiffs' titles were defective. Texaco having the better and the earlier title, therefore, its constructive possession will prevail over the plaintiffs' constructive possession even if plaintiffs had constructive possession first.
In addition, however, our review of the evidence convinces us Texaco, through its ancestors-in-title, had prior constructive possession of the disputed tract and that Texaco's constructive possession was never usurped by plaintiffs or their ancestors-in-title.
The record establishes that Texaco's ancestor-in-title, Sunset Realty & Planting Company, Inc., acquired the land in 1930 by a tax sale from Louisiana Land and Exploration Co. Plaintiffs' ancestor-in-title, Arleigh Nave, Jr., acquired the land in 1931 by act of sale from Adele Cole Jackson and others.
In our original opinion we stated we had evidence of possession only back to 1930. On re-examining the transcript, we find there is testimony establishing possession on behalf of Texaco's ancestor-in-title at least back to 1925.
Robert D. Sims, who was Texaco's property manager in the Sunset Drainage District, testified he first became familiar with the property in this area when he was 22 years old. Since he was 77 in 1980 when the trial of this matter took place, simple arithmetic tells us his initial acquaintance with the land began around 1925.
Sims testified that when he first knew the property it was being used for crop land by a Mr. Price, who raised vegetables for the market. By the time Sims first took over supervision of the property, Mr. Price had died and the land was in cattle pasture, being leased to Messrs. Pizzolato and Post. It had been leased by Joe Matise between the time Price farmed it and Messrs. Pizzolato and Post took it over. Since then the land had constantly been under grazing leases, by Texaco or its ancestors-in-title, Hibernia Bank in Liquidation and Sunset Realty & Planting Company, to various tenants. The tract in question is a wooded area within a larger area comprising approximately 400 acres of pastureland.
While Sims never stated exactly when he began working for Texaco's ancestor-in-title, we deduce it must have been in the mid-to late 1940s. He testified that Messrs. Pizzolato and Post were running cattle on *109 the property when he first became assistant to Mrs. Smith, who managed the property before him. He also said he was not working for Mrs. Smith at the time the Whitleys attempted to cut a road through the disputed land (which would have been 1946). Harry Post, the former lessee, testified he bought out Pizzolato's interest in their partnership in 1948. Therefore, Sims must have gone to work for Mrs. Smith between 1946 and 1948.
Although Mr. Sims did not state whether Mr. Price was farming the land containing the disputed tract in 1930, we know that Mr. Price was farming it under a lease in approximately 1925. We also know that Mr. Matise used the area as pastureland between the time Price farmed it and the time Messrs. Pizzolato and Post took it over.
Lloyd Dufrene, who has a pasture on the south side of the pasture in question, testified Joe Matise had been leasing the land since the early 1940s.
On the other hand, plaintiffs produced testimony that the Coles, their ancestors-in-title, had lived on the front part of Lots 45 and 47 at least to 1919. When Arleigh Nave, Jr., bought the lots in 1931, there were rows indicating the front portion had been farmed or there had been a vegetable garden.
There is a gap in the evidence of both sides relative to possession of the land to which each holds title. The plaintiffs did not establish positively that their ancestors-in-title had constructive possession in 1931, when plaintiffs bought the land. Similarly, the defendant did not establish positively such constructive possession by its ancestor-in-title in 1930.
We conclude, however, that the weight of the evidence preponderates in favor of the defendant. We find the evidence tends to show that when Sunset Realty, Texaco's ancestor-in-title, acquired the land in 1930, the cleared portion now used as pastureland was possessed on Sunset's behalf by a lessee. Since Sunset's title included the wooded tract now in dispute, Sunset acquired constructive possession of that tract.
At the same time, we find that none of the possessory acts done by plaintiffs or on their behalf were more than disturbances of defendant's possession. Certainly none of these acts usurped the prior constructive possession of defendant, for none of those acts deprived Texaco of its dominion and control over the land for the required one-year period.
We conclude that the constructive possession by Texaco's ancestor-in-title constituted good faith acquisition of the tract, because that possession continued for more than ten years after 1930 without sufficient actual corporeal adverse possession by the plaintiffs.
Finally, plaintiffs contend again on rehearing that our determination of this case must be governed by the manifest error rule. It is clear from our discussion of the law and facts, above, that the trial judge was clearly wrong, however. Thus even under the manifest error rule defendant prevails.
For the foregoing reasons, the conclusion reached in our original opinion is unchanged and our original decree is reinstated.
NOTES
[1] Those articles state:

"* * * It is not necessary, however, that a person wishing to take possession of an estate should pass over every part of it; it is sufficient if he enters on and occupies a part of the land, provided it be with the intention of possessing all that is included within the boundaries." Art. 3437.
"One may acquire possession of a thing, not only by himself, but also through others who received it for him and in his name. But in this case it is necessary that the person receiving the possession should have had intention of receiving for the other." Art. 3438.
"A person is in possession of immovable property or of a real right therein, within the intendment of the articles of this Chapter, when he has the corporeal possession thereof, or civil possession thereof preceded by corporeal possession by him or his ancestors in title, and possesses for himself, whether in good or bad faith, or even as a usurper.
"Subject to the provisions of Articles 3656 and 3664, a person who claims the ownership of immovable property or of a real right therein possesses through his lessee, through another who occupies the property or enjoys the right under an agreement with him or his lessee, or through a person who has the use of usufruct thereof to which his right of ownership is subject." Art. 3660.
[2] For convenience' sake, henceforth when referring to the parties, "plaintiff" shall be intended to refer not only to the plaintiffs in this case, but also their immediate ancestors in title, namely Joan Rockenfield Vuillemot, Ruby Nave Pflueger and Arleigh Nave, Jr. Similarly, "defendant" shall be intended to refer not only to Texaco, Inc., but also to its immediate ancestors in title, Hibernia Bank & Trust Co., in Liquidation, and Sunset Realty & Planting Company, Inc.