YELVERTON, Judge.
This is a boundary action. Plaintiffs, Dr. and Mrs. Gifford Hargis, filed suit seeking to have the common boundary between their property and that of the defendants judicially established. The plaintiffs prayed that a survey be ordered to fix the boundary. The defendants, who are four co-owners, answered claiming ownership of the disputed area by acquisitive prescription of 10 and 30 years. Defendants denied that the appointment of a surveyor was necessary. After a trial on the merits the trial court found that acquisitive prescription was not applicable since the defendants had failed to prove the required possession. The court found that the boundary was established as shown on a survey done by Stephen Gremillion in 1982. The defendants appealed. We affirm.
We shall refer in this opinion to the plaintiffs, husband and wife, collectively as Hargis, or sometimes plaintiff. The defendants-appellants are Verenco Company, Inc., Arbor, Inc., Ellis Investments, Inc., and Norman K. Martin. We shall refer to them collectively as Martin, or sometimes defendant.
THE BOUNDARY DISPUTE
Hargis, alleging that there was a dispute as to the location of his northeast and Martin’s southwest boundary, filed this suit in October 1982 to fix the boundary. Plaintiff alleged that the boundary should be fixed in accordance with an August 1982 survey prepared by Stephen Gremillion. Petitioner also asked that a surveyor be appointed by the court to determine the boundary. Defendant, in its answer, agreed that the boundary had never been fixed by agreement, but alleged that it had been fixed by its possession sufficient to establish acquisitive prescription of 10 and 30 years. The defendant further denied that it was necessary for the court to appoint' a surveyor, denied the accuracy of the Gremillion survey, and pleaded the correctness of a survey prepared by E.B. Mes-sick in 1942, averring that its possession of the property for acquisitive prescription purposes was to the extent of land shown by that survey. There are about 40 acres in the strip disputed.
The property is located in St. Landry Parish, in sections 28 and 29 of Township 3 South, Range 4 East. The compass orientation of the respective tracts is within a few degrees of running northeast and southwest, and the boundary runs roughly northwest and southeast. The quantity called for in defendant’s title is 383 acres in the southwest, while the quantity called for in defendant’s title is 500 acres in the northeast. That 500 acres long ago lost its separate identity, when in 1907 it became merged with a much larger tract owned by the Beall Estate. The deeds in the chain of title of these properties are sometimes hard to follow, especially the sale of the 500 acre tract in 1907, because of the peculiar compass orientation of the land. For example, the 1907 instrument dealing with the 500 acres designates as the north side what a continuation of the line of that side on the adjoining 383 tract is designated as the northwest side.
The line separating section 29 on the west and section 28 on the east runs north and south, of course, and the section line crosses the boundary line somewhere in the northwest portion of the disputed area.
The chains of title' go back to 1907 to a common owner, Havard, who owned a 900 acre tract. In that year, Havard sold 500 acres to Beall, by means of a description *1047 which, as synopsized by the trial judge, goes like this: 500 acres of swampland bounded north by Mary Walker, south by Beall (purchaser), east by (a blank space), and west by Havard (seller).
What in that description was called the west boundary (but is more accurately the southwestern boundary), is the boundary in dispute.
When purchased in 1907 that 500 acres was already bounded on the northeast by property belonging to the purchaser, the Beall Estate, which also owned contiguous property fanning out to the northwest and down to the southeast. The Martin interests entered the chain of title in 1942 with an option to purchase some 2,000 acres from the Beall Estate. A sketch attached to that option, at its boundary with what three years later became Hargis’ land, included all of lot 5 and about one-half of lot 6 of section 29, and all of lot 10 of section 28 and the major part of lot 11 of that section. In the instrument of sale a few days later the description of the 2,000 acres (which contains no separate identification of the 1907 sell off of the 500 acres) listed the “fractional part of lot 5 of section 29”, as well as “all of fractional section 28, with the exception of about 60 acres in the southwest corner thereof belonging to now or formerly the heirs of Mrs. A.D. Ha-vard.” No part of lot 6 of section 28 was included in that sale instrument. Thus, as between the sketch attached to the option and the language of the description in the deed, there were some rather glaring differences. These discrepancies occur right along the line where the boundary is.
Hargis, the plaintiff, acquired his title in 1945 from the heirs of the common owner, Havard, by means of a sale describing 383 acres, more or less, bounded northeast and southeast by the Beall Estate or assigns, southwest by Bayou Bouef, and northwest by a public dirt road, and being the remainder of about 900 acres from which 500 was conveyed off the “east side” by Havard to Beall in 1907. The disputed boundary in this description is where the property is bounded northeast by the Beall Estate or its assigns.
As stated earlier, each disputant in this case relies upon its own survey, the plaintiff on a survey to establish this precise boundary done by Gremillion in 1982, and the defendant on the E.B. Messick survey in 1942 of the approximate 2,000 acres purchased by it that year. While the Messick survey delineates most of the perimeter of this 2,000 acres with azimuths and distances, and shades all of the land in yellow, the boundary line on the property involved in this case, while shaded, contains no directions, courses, distances, or other pertinent measurements by means of which it would be possible to transfer that line onto the ground.
There are about 40 acres involved in the disputed area, all of which is in woods. Before 1951 Hargis cleared about 340 acres of his land. Along about this time he complained to Martin that he had noticed that Martin had painted some trees along the edge of the cleared property, which took in over 40 acres of his land. Before this time he had sold timber out of that acreage and raised cattle there. In later years Hargis talked to Martin’s people on several occasions to try to get an agreement on a common boundary, by agreeing on a survey, but these efforts were unsuccessful. Hargis once put a fence out in the woods in the disputed area, but neither he nor Martin thought of the fence as designating a boundary. Hargis explained that he put it there, not to designate a boundary, but merely to keep his cattle enclosed and to allow them a place to get cool in the summertime on occasions when they were permitted to graze on the rest of his property. There were paint marks on trees, hack marks on trees, oil and gas leases, cuttings of timber, and other acts done by both parties down through the years, all of which the trial judge considered, along with extensive testimony, with regard to the acquisitive prescription claims of Martin.
WHAT THE TRIAL COURT DID
The trial court gave detailed written reasons for rejecting these claims of acquisi *1048 tive prescription, from which we quote the following language:
“When Roy Martin acquired its property in March of 1942, it requested Mr. Messick to survey its property. He apparently did a perimeter survey; and, strangely, had distances and directions all around except in the area in dispute (see his map). He colored his lines and the area under study • in yellow, but in the area in question he simply colored the area, and didn’t give a direction and/or distance. Some time after this, Roy Martin generally took the timber line between his property and Dr. Hargis’ and painted along this line. (Dr. Hargis says he cleared to this line.) The Court’s observation is that the best they could do was guess at this line, for, in the Court’s opinion the Messick Survey doesn’t designate this particular line, so that it could be put on the ground. (Different from the acreage survey of Mr. Gremillion, no one has correlated the Martin purchase in acres to see how many would be necessary to fulfill his sale.) Thereafter, Roy Martin took a stand on these markings, taking the position the Messick Map was definitive, and would not budge from that position.
“On the other side, the Roy Martin files indicate that as early as October 12, 1951 (B-40) Dr. Hargis was contesting the Martin claim, and making one of his own. In the 50’s he fenced along the timber line to keep his cattle in, and the ‘woods cattle’ out; and, some time in the 50’s built another fence in the woods itself for the same reason. So, as early as the 1950’s, Dr. Hargis was going over and fencing in the disputed area. (Of course, during the same period, and before and after, Roy Martin was painting what he claimed to be the line.) Note also, B-14 and B-15, — from the Martin files, — wherein it is shown that again in 1971 the dispute was still going on.
“Dr. Hargis leased the land for Oil, Gas & Mineral purposes in 1977, (Hargis-7) but it sheds no light. Again in 1961, he granted a pipeline right-of-way (Hargis-6). It sheds no light.
“Both claimed they logged the property in dispute and the Court believes both (neither denied that the other logged the land).
“Martin has many reports from its Foresters showing no interference or trespassing with the land. But these don’t consider Dr. Hargis’ logging and/or fencing. See B-5; B-6 notes Dr. Hargis’ survey in 1983; B-7; B-36; B-35; B-30; B-37; B-39; B-21; B-44 notes a fence down (probably the fence along the timber line, but the report is not clear); and B-9.
“Martin leased for Oil, Gas & Mineral activities in 1946, which only claims 13.15 acres in Lot 5, Section 29, but doesn’t help with Section 28 (B-38). He also leased in 1951 with about the same description.
“A great deal of evidence was introduced as to blazes and hack-marks. The Court cannot determine who put them there, and in some instances how long they have been there. But, the Court observes there are two isolated markings. However, since they do not establish a cohesive ‘line’, they are disregarded. Actually, the paint would argue more forcefully for a ‘line’; but, as herein pointed out, this was placed on a guess; and the property it encompasses was not ‘possessed’ exclusively by Martin.
“The ‘witness tree’ gave the Court some pause. The Court believes it was more an intention to attempt to mark the Section boundaries between Sections 38 and 29 than anything else. If it was placed for any other reason, it was simply placed on a ‘guess’ as the Court finds it was not proven to mark an actual survey. The Court has some reservations as to who placed it there.
“(If the Court had to make a finding, it would believe that Roy Martin put all the marks, paint, etc., being experienced in this area. However, if he did, it was placed on a guess, was not recognized as a boundary, and was placed on a guess at a convenient place, — convenient for Roy Martin, that is.)”
After finding that defendant had failed to prove acquisitive prescription of either *1049 10 or 30 years, the trial court thereafter studied the Gremillion survey and the Mes-sick survey and concluded that the line as fixed by the Gremillion survey was the correct boundary. Defendant’s appeal contests these findings of the trial court.
THE CIVIL CODE
The pertinent Civil Code articles for fixing a boundary line are as follows:
“Art. 792. Fixing of boundary according to ownership or possession
“The court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to limits established by possession.
“Art. 793. Determination of ownership according to titles
“When both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author preference shall be given to the more ancient title.
“Art. 794. Determination of ownership according to prescription
“When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.”
Former C.C. art. 853 provided for a 10 year acquisitive prescription in fixing a boundary where there was active acquiescence of a visible boundary by the adjoining landowner for a period of 10 years. That article was not repealed until January 1, 1978.
ACQUISITIVE PRESCRIPTION
Defendant pleaded acquisitive prescription. Since acquisitive prescription takes precedence over claims based on titles, C.C. art. 794, the trial judge first considered the evidence for prescription, and found that the evidence failed to prove it. We find no error in this factual determination.
For 10 years acquisitive prescription under former C.C. art. 853 to apply there must be a showing that plaintiff actively acquiesced in the painted timberline as forming the boundary between the properties. See Deshotel v. Lachney, 465 So.2d 974 (La.App. 3rd Cir.1985). In the present case it is clear that the plaintiff continuously disputed the defendant’s location of the boundary. The plaintiff sent correspondence to the defendant disputing the boundary as well as engaging in acts of possession over the disputed area such as running cattle, cutting timber, and building a fence in the disputed area. The trial court was correct in finding 10 year acquisitive prescription inapplicable.
The record also establishes that the 10 year acquisitive prescription of La. C.C. art. 3473 and the 30 year acquisitive prescription under La.C.C. art. 3486 were not proved. The party who makes the plea of acquisitive prescription bears the burden of proving all of the facts that are essential to support it. Briggs v. Pellerin, 428 So.2d 1087 (La.App. 1st Cir.1983). It is essential to any claim of acquisitive prescription that the possession on which it is based be continuous and uninterrupted. C.C. art. 3476 and Voisin v. Luke, 341 So.2d 6 (La.App. 1st Cir.1976), writ denied, 342 So.2d 224 (La.1977).
Taken as a whole, the record reflects that both sides in the controversy as well as their ancestors in title have exercised acts of possession over the disputed property for many years. The defendant cut timber on the property three times while the plaintiff cut timber once. They both executed leases over the property. Witnesses testified that the defendant marked the treeline in yellow paint in 1957 and every few years thereafter. Plaintiff’s witnesses disputed the existence of a painted treeline until 1971. Hargis built a fence across the disputed property in about 1954 and raised cattle on the property. Hargis also continuously disputed the existence of *1050 the treeline as a boundary and repeatedly over the years requested a joint survey to determine the boundary.
The proof required under C.C. art. 794 to fix the boundary according to prescription is the same proof that would be required to prove ownership in a pet-itory action based on the plea of 30 years acquisitive prescription. Travis v. Lake Superior Piling Co., 401 So.2d 432 (La. App. 1st Cir.1981), writ denied, 406 So.2d 628 (La.1981). These are fact determinations. Briggs v. Pellerin, supra. The occasional cutting of timber in isolated woodlands or swamp is not such a continuous possession that will ripen into a title adverse to the true owner. James Harvey Ramsey Estate, Inc. v. Pace, 467 So.2d 1202 (La.App. 2nd Cir.1985), writ denied, 472 So.2d 918 (La.1985). When neither side ever exercised continuous, uninterrupted, peaceable and unequivocable possession of the disputed area long enough to acquire it through prescription, the claims of acquisitive prescription either for 10 or 30 years must be denied. Whitley v. Texaco, Inc., 434 So.2d 96 (La.App. 5th Cir.1983), writ denied, 435 So.2d 445 (La.1983).
FIXING THE BOUNDARY ACCORDING TO TITLES
Having determined that acquisitive prescription had not been proved, and that ownership of any part or all of the disputed area was not established by that means, the trial court next examined the evidence to determine if the boundary could be fixed according to the ownership of the parties, C.C. art. 792. The trial court then decided that ownership could not be determined by titles, and, after further concluding that neither side had proved possession, and that therefore the boundary could not be fixed according to the limits established by possession, C.C. art. 792, the trial court resorted to the surveys, accepting the survey of Gremillion and fixing the boundary in accordance therewith. While we agree with the ultimate resolution of the case by the trial judge, we disagree with the process of reasoning employed by the trial judge in obtaining this result. It is our opinion that ownership could be, and was by the Gremillion survey, determined by titles. Our reasoning employs the same facts as used by the trial judge in reaching this conclusion.
The 1942 Messick survey, on which defendant relies to delineate its southwestern boundary, contains a pencil line and yellow shade to mark the southwestern boundary of the 500 acres, but it is impossible from this survey to put that line on the ground. Unlike other perimeter boundaries of the over-2,000 acres' this survey purports to cover, there are no calls or distances, no monuments, no means whatsoever that could be used to transfer this line from the paper to the ground. Significantly, this survey also declares that the acreage surveyed was described as containing 2,015 acres, more or less, but that it actually contained “approximately” 2,120.97 acres. The inconsistencies of this survey, as compared with other evidence offered by defendant, as affecting the boundary dispute in this case, are easy to spot. The Messick yellow shaded area includes the northeast corner of lot 6 of section 29, but that lot is not listed in the summary of acreage on the survey, nor is it mentioned in the deed itself. If the failure to list that acreage was an oversight, the Martin acreage contained even more than what its deed called for. If the list was not an oversight, then the penciled line and shaded yellow area insofar as it affects this particular boundary was a mere guess and was not meant to suggest an accurate survey. Of most telling significance, however, to show that the Messick boundary was a mere vicinity sketch and not intended as an accurate survey of this boundary, was the exclusion of 60 acres in section 28 in Martin’s chain of title to the 500 acres. By even an “eyeball” examination, the Messick boundary line fails to exclude this 60 acres. Because of the configuration of section 28 in that area, the 60 acres would have to come from lots 9, 10, and 11. The Messick survey boundary sketch, however, as indicated by the summary of acreage shown thereon, *1051 excludes far fewer acres from section 28 than the deed description of 60 acres.
There is very little disagreement as to the location of the northwest starting point of the boundary line. Both the Messick and the Gremillion surveys put this point at very near the same place. It is also undisputed that the boundary line goes through lot 5 of section 29. That lot contains 26.30 acres. Martin down through the years in other notarial acts on record has claimed ownership of 13.15 acres of that lot, or exactly half of it. It seems to be agreed also that this boundary line is a straight line. A straight line, starting at the agreed point on the northwestern end of the boundary, and drawn so as to bisect lot 5 of section 29, which will give defendant the exact acreage in that lot it has always claimed, and drawn so as to eliminate all of lot 6 of section 29, which is not in defendant’s chain of title, and also drawn so as to exclude the 60 acres in the southwest corner of section 28, which defendant’s chain of title requires be done, will comply with defendant’s title instruments. The Gremil-lion survey did just that, projecting a straight line in a southeasterly direction. The trial court accepted the logic and reasonableness of the Gremillion survey based on the record, in the following language which we quote:
“The only logical and reasonable solution is to do what Mr. Gremillion did; and that is to take the Martin Title; allocate the 13.15 acres it claims in Lot 5 of Section 29, take out the 60 acres their title says he does not have in the Southwest comer of Section 28. This gives an unconnected configuration. Logically, the next stip [sic] is to take the South line of the 13.15 acres and the North line of the 60 acres and connect them, as Mr. Gremillion did. Then, prove the result by counting the acres which fall to Dr. Hargis by this method, which turns out to be 380 acres. (His title calls for 383 acres, more or less, less a road.)”
The defendant finds fault with this reasoning by pointing out that the 60 acres excluded in the southwest comer of section 28 was 60 acres “more or less.” Defendant also argues that this line fails to give him the 26 acres out of lot 10 and the 3.30 acres of lot 11 of section 28, that his deed calls for. In response to this argument we point out that the 26 acres and the 3.30 acres are likewise recited in the deed as “more or less.” Further, defendant observes that his deed calls for all of lot 5 of section 28, whereas a small corner (which the author of this opinion believes to be less than one acre) is taken away from him by the Gremillion survey. All three of these discrepancies are conceded, but the overall soundness of the Gremillion analysis is not damaged thereby. The Gremil-lion boundary line substantially satisfies the Martin record title, and in sufficient detail to lead to the reasonable assurance that it is a correct boundary. The minor discrepancies weigh on both sides of the argument and are simply not sufficient to overcome the positive title facts which support the location of the Gremillion boundary. By contrast, the Messick survey is obviously erroneous. It locates the boundary at a place substantially in conflict with defendant’s deed of acquisition, as well as other recorded instruments affecting his title.
Both sides insist on this appeal, as they did in the district court, that the case be decided on the basis of the surveys before us. Nevertheless, we have given some consideration to remanding the case with instructions to the trial court to appoint a surveyor for the purpose of attempting a survey of the 500 acre sale in 1907. This 500 acres, if its exact location could be determined, would make possible a total compliance with C.C. art. 793: “[w]hen the parties trace their title to a common author preference shall be given to the more ancient title.” In this case the defendant’s title is derived from the 1907 sale of 500 acres from Havard to Beall and is the more ancient title. We decline to remand, however, for three reasons. First, we doubt, as a practical matter, whether a survey of that 500 acres at this late date could be done without uncovering more *1052 boundary questions than it could possibly solve. The difficulty of getting a present survey of that 500 acres, poorly described in 1907 and thereafter merged into a tract of 2,000 acres, never thereafter to have a separate identity, is at once obvious. One side of the description of the four-sided tract was left blank, and two others were described merely as bounded by vendor and purchaser. For nearly 80 years this tract has had no separate identity, and because of the vagueness of its original description the chances of locating monuments, natural or artificial, after all this time are probably extremely remote. Our second reason for discarding the notion of remanding this case for another survey is because we find, as did the trial judge, that the acreage requirements of the 1907 sale have been demonstrably satisfied. As stated earlier, this 500 acres, long before its purchase in 1942 by Martin, had been merged into a much larger Beall estate consisting of 2,000 acres. The Messick survey of 1942 recites, over the signature of E.B. Messick, that it is a re-survey and a re-marking of “the boundaries of the greater portion” of a certain tract of timber land acquired by Martin from the estate of Beall, “described as containing 2,015 acres more or less, but actually containing approximately 2,120.97 acres.” The summary of acreage on that survey, listing by section and lot, does in fact add up to a total of 2,120.97 acres. As pointed out by the trial judge after hearing a motion for a new trial by defendant limited to reargument, according to the Messick survey Martin already has over a hundred acres more than his deed called for. Since the amount of acres in dispute in this case is substantially less than that, there is at least a mathematical probability that defendant’s more ancient title is fully satisfied by the Gremillion survey. Our third reason for not remanding is that the trial judge’s solution, following the sound application of title facts by the surveyor Gremil-lion, not only satisfies both titles, but also appears to be eminently fair. It appears to satisfy Martin’s title to 500 acres in that area. Although it falls three acres short of Hargis’ title to 383 acres, he has not appealed. La. Code of Civil Procedure art. 3692 authorizes the court to appoint a surveyor in a boundary action, but does not require such an appointment, as did the former law. As observed by the comment to this article, since the parties in a boundary action may submit surveys and exhibits, and proffer expert testimony, the court may be able to reach a decision without the assistance of a court appointed surveyor. In the present case, each party relied upon his own survey. The trial court worked very hard to find a fair solution to this dispute, and we think he found it. We do not believe that justice will be any better served by a remand.
For the reasons above explained, we believe that the trial court has correctly fixed the boundary in question, and that it has been determined in accordance with the ownership of the parties as reflected by the titles. We affirm. The costs of this appeal are assessed to appellants.
AFFIRMED.