WICKER, Judge.
The plaintiffs, Mary Dorothy Boneno, Luke Boneno,[1] Richard N. Boneno, Elizabeth Hymel Duhe, Jolyn Duhe Johnson, Allen J. St. Pierre, and Audrey Millet St. Pierre (the Boneno group) appeal the dismissal of their possessory action against defendants George A. Lasseigne, Jr.; Theresa Aycock Madere; Joseph Junius Ory; Doris Lasseigne Carville; Fernand J. Aycock, Jr.; Bernice Ory Fulton (the Lass-eigne group); and St. John Fleeting, Inc. The issues are proof of the Boneno group’s entitlement to possession, the release by the judge of St. John Fleeting, and the admission over objection of a certain deposition. We affirm.
The property at issue is batture land in Garyville, St. John the Baptist Parish, on the river side of the levee from land belonging to the Boneno group. This group claims to have been in possession, evidenced by acts of a possessory nature, since 1941, although it does not claim ownership. The Boneno group sued the Lass-eigne group, lessor, and St. John Fleeting, lessee, for having disturbed its possession of the batture in 1983.
The issue of prescription of the possesso-ry action was resolved in favor of the Bone-no group in two cases out of this circuit: Boneno v. Lasseigne, 514 So.2d 276 (La.App.1987) and 534 So.2d 968 (1988).
Trial on the merits resulted in a judgment dismissing the case because “the plaintiffs did not establish that they ever possessed the property within enclosures sufficient to give definite notice to the public of the extent of their alleged posses-sion_” The judge released St. John Fleeting on his own motion during the trial, believing that nothing had been proven against it.
The Boneno group, in order to maintain a possessory action, must prove (1) it had possession of the property at the time of the disturbance, (2) it and its ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, (3) the disturbance was in fact or in law, and (4) its possessory action was filed within a year of the disturbance. La.C.Civ.P. art. 3658; 2 La. Civ. Law Treat. (Yiannopo-lous) 2d, Section 210 at 563.
What constitutes possession depends largely on the nature of the property.... Further, where an individual claims by corporeal detention alone and without title, he must show an adverse possession within enclosures .... “Enclosed” does not necessarily mean “fenced in”, but does require “that the land actually, physically, and corporeally possessed by one as owner must be established with certainty, where by natural or by artificial marks; that is, that they must be sufficient to give definite notice to the public and all the world of the character and extent of the possession, to identify fully the property possessed, and to fix with certainty the boundaries or limits thereof.” Hill v. Richey, 221 La. 402, 59 So.2d 434 (1952).
*596 The corporeal possession required to institute a possessory action corresponds with the possession necessary for acquisitive prescription of thirty years.... Consequently, the possession must be open, continuous, public, unequivocal and uninterrupted with the intent to possess as owner.... The intent to possess as owner cannot be inferred when the circumstances are insufficient to give reasonable notice to the public and the owner of the property that the possessor is unequivocally possessing as owner....
City of New Orleans v. New Orleans Canal, Inc., 412 So.2d 975, 981 (La.1982) (emphasis added; some citations omitted). This case, involving a claim by New Orleans of possession of a large tract similar to a neutral ground fronting West End Boulevard near the lakefront, was originally resolved in the city’s favor, the Court holding that cutting grass and construction and repair of utilities and streets were apparent to all. The Court reversed itself on rehearing, holding that the lack of boundary markers made the property in dispute indistinguishable from any other in the area of this neutral ground and resulted in the city’s failure to show possession within enclosures and the extent of its claim. The Court cited with approval the language of the appellate court:
“The concept of enclosures is pertinent to the determination of extent of possession.... [W]hen a possessor does not have a title, his claim of possession is limited in extent to that property shown by enclosures (artificial or natural boundaries) and his possession must be proved ‘inch by inch’, so that the possessor must establish actual, physical and corporeal possession over the entire amount of land claimed in the possessory action. Stated otherwise, the possessor without title is entitled to be maintained in possession only to the extent of the boundaries within which he proved actual, physical and corporeal possession. ...”
At 982 (emphasis added; citations omitted). Accord: Chevron U.S.A. Inc. v. Landry, 558 So.2d 242 (La.1990). “[Ijsolated acts of a transitory nature” are insufficient to establish possession. Plaisance v. Collins, 365 So.2d 608, 616 (La.App. 1st Cir.1978). Further, the execution of a lease is insufficient to establish civil possession absent some corporeal possession. Ree Corporation v. Shaffer, 261 La. 502, 260 So.2d 307 (1972).

Allen St. Pierre’s Testimony

Allen St. Pierre, one of the plaintiffs, testified that he moved with his family to the St. Pierre tract as a child in 1944. The ramp which crossed the levee from Jefferson Highway to the batture was already in place. Mr. Boneno, since deceased, acted as spokesman for the nine families occupying adjacent tracts with regard to the bat-ture, which apparently all families believed they owned. Mr. Miaño purchased and hauled riversand from this batture from sometime in the 40’s until the early 70’s. He would make one payment to Mr. Bone-no, who would in turn divide the money in nine equal portions. No one knew exactly where on the batture the sand came from as, for the purpose of selling sand, the families treated the batture as just one piece.
AAA Contractors began hauling sand in the late 40’s and early 50’s. Mr. St. Pierre joined the service and was stationed in Korea from about 1951 through 1953. During this time, he had no personal knowledge of what happened on the batture. Sometime during the 50’s, Broussard’s Beach was established. This was a little area of beach on the batture which Mr. Broussard and others used as a recreational area with the permission of Mr. Boneno.
In the late 50’s through the early 60’s, Mr. Pollet began hauling sand from the batture. The families also leased part of the batture to AAA. Mr. St. Pierre bought the family tract from his father in 1958.
For one-and-a-half years in the early 60’s, Mr. Trosclair hauled sand from the batture. He also renovated the ramp to avoid crossing over the Millet property. The police jury took sand and sand was donated to the church during the 60’s. The families also granted a mineral lease for the batture to Mr. Magruder.
*597 The last sales of riversand took place in the early 70’s, and Mr. St. Pierre took over as family spokesman from Mr. Boneno sometime in the early to middle 70’s. At this point, there were only three families for whom he was spokesman — the Bone-nos, the St. Pierres, and the Duhes — since the other families had begun to make their own arrangements. Some time in the middle to late 70’s, the police jury took sand from the batture; and actual sand hauling took place until about 1982.
In 1982, the families leased the batture to Midstream Barge; and St. John Fleeting began operations on the next-door Millet property. The Lasseigne group leased the batture to St. John Fleeting in 1983.

Mr. Favo Monica’s Testimony

Favo Monica was in the sand-hauling business. He testified that Mr. Pollet hauled sand from the batture in question from the late 50’s until the very early 60’s. He himself was in the service from about 1959 until 1966. Mr. Trosclair hauled sand for about a year in the early 60’s, and he hauled sand from the middle 60’s until about 1971. Sand was bought from the batture property from 1968 to 1971. Mr. Miaño hauled sand until 1978.

Mr. O’Neil Vincent Hymel’s Testimony

O’Neil Vincent Hymel testified Mr. Tros-clair hauled sand from the batture in 1952, and he himself worked for Mr. Pollet hauling sand from 1953 until 1955.

Mr. Felix LeBoeufs Testimony

Felix LeBoeuf testified that sand for a ball park was obtained from the batture in the middle 40’s. Broussard’s Beach existed on the batture from the middle 40’s until the late 50’s. Mr. Miaño did most of his hauling between 1950 and 1960, but he was still hauling until the early 80’s when he died.

Mr. Carol Keller’s Testimony

Carol Keller testified that he worked for Mr. Pollet hauling sand for some months in the mid 50’s. Mr. Keller stopped working as a sand hauler in 1967.

Mrs. Mary Dorothy Boneno's Testimony

Mary Dorothy Boneno moved with her family to the Boneno tract in 1932. She thought Broussard’s Beach was in place sometime in the 30’s. The families signed a mineral lease with Mr. Miller in 1938. In the early 40’s, the ramp was built and Mr. Miaño started hauling sand. He hauled until the very early 80’s.
The families entered into a mineral lease of the batture with Mr. Paret in 1949. Mr. Pollet hauled sand from the late 40’s until the middle 50’s. A mineral lease with Mr. Murphy was signed in 1955, and AAA hauled sand for the Kaiser plant for a couple of years in the mid 50’s. Around this time the families donated riversand to the church. Mr. Trosclair hauled sand in the late 50’s and early 60’s.
The families signed another mineral lease with Mr. Magruder in 1962, and Mr. Pollet hauled sand and may have renovated the ramp at this time. In the middle 60's, the trees started getting thick on the bat-ture. Mr. Monica hauled sand in the middle or late 60’s.
A five-year lease with Midstream Barge was signed in 1981.

Mr. Wilbert Joseph Broussard’s Testimony

Wilbert Joseph Broussard testified that, with the permission of Mr. Boneno, he built Broussard’s Beach for the enjoyment of his family and friends. The recreation area, which consisted of a temporary camp rebuilt each year after the waters of the batture receded, was in existence from the early 60’s until the early 80’s.

Mrs. Elizabeth Hymel Duhe’s Testimony

Elizabeth Hymel Duhe testified that she moved to her present location in 1956 but was familiar with the area much earlier because she lived there with her parents. Mr. Trosclair hauled sand from the batture from the mid 50’s until about 1960, and the church hauled sand from this location in the late 50’s. The families gave Mr. Brous-sard permission to construct Broussard's Beach around 1960.

Mr. Henry Smith’s Testimony

Henry Smith, a sand pumper and hauler, testified that he had a lease with the Lass-eigne group for sand hauling from an adja *598 cent batture from 1974 until the mid 80’s. He ceased operations in the late 70’s because of a lack of demand and he saw no other sand activity on the subject batture during the time of his lease.

Mr. Ronald Joseph Amedee’s Testimony

Ronald Joseph Amedee testified he lived on the property next to the Duhes from 1940 until 1958 or 60 and that his mother still lives there. Mr. Pollet hauled sand from the 50’s to the 60’s, as did Mr. Tros-clair. He himself worked for Mr. Pollet for about four years starting in 1985, but he was involved in hauling spillway sand not riversand. Mr. Miaño hauled, mostly part time in the summer, for about fifteen years in the 50’s and 60’s.

Conclusion

There is no contention that sand hauling activities were continuous, since all parties concede that the batture is under water part of every year and is consequently too wet to take sand from for an additional period after the water recedes. It also does not appear to be contended that any of the Boneno group’s lessees, either the mineral lessees or Mainstream Barge, pursued any activity as a result of these leases.
The only evidence of enclosures in the record comes from a drawing introduced by the Boneno group which does not purport to be to scale. It shows the natural boundaries of the levee and the river on two sides. On the upstream side, it shows the ramp which crosses the levee for access to the batture. On the downstream side, however, there is no boundary. What purports to be a boundary is a “sand levee”, apparently left over from Mr. Smith's sand pumping activities. This levee, if it constitutes a boundary, is located between the extended lines of the Amedee and Hymel properties, so it cannot serve as a boundary of the batture in question.
We agree with the judge that the Boneno group has failed to meet its burden of proving possession, which is the threshold issue. Since the Boneno group had no title, it was required to show enclosures sufficient to give notice “to the public and all the world of the character and extent of the possession, to identify fully the property possessed, and to fix with certainty the boundaries or limits thereof.” Hill v. Richey, supra. Even the proponents of possession admittedly did not know from which tract at any given time sand was being removed and thus cannot prove “inch by inch” their possession of the batture.
We pretermit a ruling on the other issues raised, the Lasseigne group’s claim of prescription and the Bonenos group’s complaints of evidentiary rulings and the dismissal of St. John Fleeting, since we are affirming the judge’s legal and factual findings on the merits.
The judgment in favor of George A. Lasseigne, Jr.; Theresa Aycock Madere; Joseph Junius Ory; Doris Lasseigne Car-ville; Fernand J. Aycock, Jr.; Bernice Ory Fulton; and St. John Fleeting, Inc. is affirmed. Mary Dorothy Boneno, Luke Bo-neno, Richard N. Boneno, Elizabeth Hymel Duhe, Jolyn Duhe Johnson, Allen J. St. Pierre, and Audrey Millet St. Pierre must pay the costs of this appeal.
AFFIRMED.

. Mr. Boneno died and his widow, Anna Belle D. Boneno, has been substituted by our order of October 5, 1991.