COUNSEL FOR PLAINTIFF/APPELLEE-2ND APPELLANT, ROY ANDERMANN, Frederic C. Fondren, Paul G. Aucoin, Charles G. Blaize, Jr.
COUNSEL FOR INTERVENOR/APPELLANT, ST. JAMES PROPERTIES, INC., Robert J. Burvant, Robert J. Stefani, Jr., Amanda A. James
COUNSEL FOR INTERVENOR/APPELLEE, UCAR PIPELINE, INC. David M. Bienvenu, Jr., Lexi T. Holinga, Anthony J. Lascaro, Martin S. Triche
COUNSEL FOR DEFENDANT/APPELLEE, JOHNNY ROUILLIER, Lana O. Chaney, Charles S. Long
COUNSEL FOR DEFENDANT/APPELLEE, LISA POCHE CALHOUN, Lisa Poche Calhoun
Panel composed of Judges Susan M. Chehardy, Fredericka Homberg Wicker, and Hans J. Liljeberg
LILJEBERG, J.
*388 Plaintiff/Appellant, Roy Andermann, and Intervenor/Appellant, St. James Properties, Inc., each appeal the trial court's September 20, 2017 Final Judgment, setting a boundary between property owned by Andermann and defendant/appellees, Johnny Patrick Rouillier and Lisa Poche Calhoun.[1] The trial court also dismissed Andermann and St. James' claims of ownership over disputed property located along the boundary between the properties. For reasons stated more fully below, we affirm the trial court's September 20, 2017 Final Judgment and remand for the trial court to amend the judgment to further specify that the boundary is set in accordance with the January 5, 2007 Fairburn Survey referenced in Andermann and St. James' Act of Partition. We further instruct the trial court to attach a copy of the 2007 Fairburn Survey to its amended judgment.
INTRODUCTION
This boundary action involves a dispute over possession and ownership of approximately three acres, referred to as the "gap tract," located between property owned by Andermann, and adjoining landowners, Johnny Patrick Rouillier and Lisa Poche Calhoun. Andermann and St. James own partitioned lots located in the downriver tract (the "Andermann Tract") and Rouillier and Calhoun own the adjoining upriver tract (the "Rouillier/Calhoun Tract"). The parties contend the gap tract consists primarily of trees located in the rear portion of the tracts. No visible markers or monuments existed on the gap tract to define a boundary between their properties.
The boundary issue did not arise until intervenor, UCAR Pipeline, Inc. ("UCAR"), approached Andermann in 2006, to obtain a right of way/servitude along the entire length of the Andermann Tract to build and operate a pipeline. At that time, Andermann co-owned the Andermann Tract with St. James. Andermann did not inform St. James of UCAR's plan to install the pipeline on the Andermann Tract. Rather, he entered into an agreement with St. James to partition the Andermann Tract, thereby allowing Andermann to acquire full ownership of the land where UCAR intended to place the pipeline. In 2007, Andermann hired Alvin Fairburn to survey and subdivide the Andermann Tract ("2007 Fairburn Survey"). In order to save time and money, he provided Fairburn with a survey of the Andermann Tract drawn in 1978 by surveyor Felix Dornier ("Dornier Survey"),[2] and asked him to use this survey to subdivide and partition the Andermann Tract between himself and St. James.
After the partition, Andermann provided UCAR with the 2007 Fairburn Survey and UCAR used this survey to prepare the pipeline servitude Andermann granted to UCAR. Based on this survey, UCAR also determined it would need a servitude from the adjoining landowners, Rouillier and Calhoun, as the pipeline would cross into their property as it approached Highway *389 3125.[3] After UCAR began clearing the land to construct the pipeline, Andermann and St. James raised issues with UCAR regarding ownership of the property where Rouillier and Calhoun granted the servitude. After comparing the 2007 Fairburn Survey with the Landry Survey contained in Rouillier and Calhoun's chain of title, it became evident that a three-acre triangular shaped gap existed between the surveys that started in the rear portion of the properties at the 40 arpent line and grew wider as the line approached the 80 arpent line.
Andermann instituted the boundary action against Rouillier and Calhoun on January 14, 2010, requesting the trial court set the boundary on the upriver side of the gap tract because he owned this property based on his title and under the theory of acquisitive prescription. Andermann and St. James allege the property descriptions in their chain of title indicate their property is bounded above by the Rouillier/Calhoun Tract, and Rouillier and Calhoun's title sets that boundary according to the Landry Survey. Andermann and St. James argue that based on the Landry Survey, the gap tract is included in their title. Therefore, Andermann and St. James requested that the trial court refer to the property description and survey contained in Rouillier and Calhoun's chain of title and set the boundary according to the Landry Survey.
St. James filed a Petition for Intervention on September 10, 2010, alleging it co-owns the gap tract with Andermann. UCAR filed a Petition for Intervention on August 6, 2010, aligning with Rouillier and Calhoun on the grounds that the boundary litigation would affect its pipeline servitudes.
Rouillier and Calhoun, on the other hand, contend the boundary should be set on the downriver side of the gap tract as they acquired the right to possess the gap tract by their own acts of possession and by means of a pipeline servitude they granted to UCAR in 2008. Rouillier and Calhoun contend UCAR precariously possessed the gap tract on their behalf for more than one year and they acquired the right to possess this property. As a result, they argue the trial court correctly presumed them to be owners of the gap tract and required Andermann and St. James to prove their title to the gap tract pursuant to the property descriptions and survey contained in their own chain of title.
For reasons set forth more fully below, we find the trial court did not err by setting the boundary in accordance with the 2007 Fairburn Survey referenced in Andermann and St. James' Act of Partition. The trial court properly determined that Rouillier and Calhoun acquired a right to possess the gap tract by means of the servitude they granted to UCAR. Because Rouillier and Calhoun were in possession of the gap tract, Andermann and St. James were required to prove their title to this property by establishing "title good against the world" - that is without relying on property descriptions and the Landry Survey contained in Rouillier and Calhoun's chain of title. Andermann and St. James were not able to prove ownership of the gap tract by title or acquisitive prescription. Therefore, the trial court correctly determined the boundary in accordance with the last option provided under boundary law - Rouillier and Calhoun's possession of the gap tract.
PROCEDURAL HISTORY
The parties tried this boundary action before Judge Alvin Turner, Jr. for six days *390 in early 2013. Shortly after the trial concluded, the judge recused himself from deciding the boundary issues. The grounds for recusal arose after the judge appointed an expert surveyor to assist him in addressing certain issues raised during the trial.[4] Shortly thereafter, the judge learned the court-appointed expert spoke with one of Rouillier/UCAR's expert surveyors who testified at trial.[5] Following Judge Turner's recusal, this matter was transferred to Judge Jessie M. Leblanc.
On June 28, 2013, Judge Leblanc held a status conference and informed the parties she would appoint James Falgout as an expert surveyor to assist her. Pursuant to Judge Leblanc's request, the parties submitted post-trial briefs in January 2014, and the court heard oral argument on May 12, 2014. In the meantime, Judge Leblanc learned the surveyor she appointed discovered a conflict of interest requiring him to withdraw from the case. A second attempt to appoint a surveyor met the same fate. The matter remained dormant for over three years while the trial court searched for a surveyor who did not have a conflict of interest. In its written reasons, the trial court explained that every surveyor it contacted had either consulted with one of the parties regarding this litigation or was unwilling to serve as a court-appointed surveyor. According to St. James, it requested a conference with the trial court in April 2017, regarding the status of the matter. At the conference, the trial court indicated it would render a decision without the assistance of an expert surveyor.
On September 20, 2017, the trial court found in favor of Rouillier and Calhoun and determined the boundary depicted in the "Fairburn Survey shall be judicially established as the boundary between Andermann/St. James and Rouillier/Calhoun." The trial court further dismissed any ownership claims over the gap tract raised by Andermann and St. James, and assessed all costs against them. Finally, the trial court designated its ruling as a final judgment for appeal purposes.
In its written reasons, the trial court indicated that Andermann and St. James were required to establish "title good against the world" without referring to the Landry Survey and property descriptions contained in the Rouillier/Calhoun chain of title. The trial court noted the Landry Survey did not appear anywhere in the Andermann/St. James' chain of title. The trial court further indicated Andermann and St. James could not establish title to the gap tract based on their own chain of title. The trial court noted evidence indicating the descriptions used in the 1874 sale from the Hampton sisters to Andermann and St. James' ancestor in title, Melford Webre, called for proration or proportionality in establishing the property lines, and further noted the 2007 Fairburn Survey satisfied these descriptions:
Defendants contend that the calls used in the 1874 sale from the Hampton sisters to Webre call for proration or proportionality in locating the boundary. The Webre sale did in fact contain a boundary, that being the White Hall Plantation. While no original subdivision *391 plat of White Hall Plantation could be located, other historical records contain surveys that satisfy the property description of proration or proportionality. Andermann's expert surveyor, Anthony Cavell, acknowledged a survey done by Guy Seghers pertaining to a portion of White Hall Plantation in 1937. The survey plat contains a section entitled 'Historical Data,' which reads, 'This Plantation was subdivided by a Mr. Cleron into 26 lots with the side lines closing or converging in the rear in the same degree as the main tract of Whitehall Plantation.' The survey also provides that each lot was 81.67 feet on the 40 arpent line.
There were two other calls in the Webre sale property description that satisfy proration. The first is the reference in section (1) which only describes the first 40 arpents. The reference is 'to measuring one arpent and a half front on said river, running between lines closing in the rear as the same degree as the main tract of White Hall Plantation.' The second is in section (2) which refers to the land between the 40 arpent and 80 arpent line. This reference is 'in proportion of the whole double concession lands claimed by vendors to the main tract of White Hall Plantation.' Again, Andermann's expert, Mr. Cavell, admitted in trial that the boundary line depicted in the Fairburn survey satisfies the 'calls' in the Hampton sale to Webre that requires boundaries to be established based on proration between the subdivided lots in White Hall Plantation.
The trial court ultimately determined the only survey contained in the Andermann/St. James' chain of title was the 2007 Fairburn Survey, which did not include the gap tract, and therefore, Andermann and St. James could not prove title to the gap tract through their own chain of title. After rejecting Andermann's arguments regarding ownership of the gap tract by means of acquisitive prescription, the trial court then turned to the final prong available to fix a boundary - possession. The trial court determined Rouillier and Calhoun acquired possession of the gap tract through UCAR's precarious possession exercised by means of the pipeline servitudes they granted to UCAR over the gap tract. The UCAR servitudes set the property line between the parties' properties according to the 2007 Fairburn Survey. Therefore, the trial court determined the boundary should be fixed according to the boundary depicted in the 2007 Fairburn survey.
CHAIN OF TITLE FOR ANDERMANN AND ROUILLIER/CALHOUN TRACTS
The properties at issue historically formed part of White Hall Plantation. The Hampton sisters acquired the property in 1869 and subdivided the plantation into 26 lots. The Rouillier/Calhoun Tract is adjacent to and upriver from the Andermann Tract. Both properties are narrow tracts that run from the east bank of the Mississippi River through the 40 arpent line, across Highway 3125, and end at the 80 arpent line.[6] The parties do not dispute the location of the boundary between the Mississippi River and the 40 arpent line; the dispute relates solely to the boundary between the 40 arpent line and the 80 arpent line. Property between the 40 arpent and 80 arpent lines are referred to in the property descriptions in the older title documents as "double concession" lands.[7]
*392 The disputed gap tract at issue in this matter runs along the entirety of the properties in the double concession lands between the 40 and 80 arpent line in the shape of a triangle. A copy of a February 9, 2011 survey map prepared by Rouillier/UCAR's expert surveyor, David Patterson, illustrating the gap tract (shaded area) existing between the Andermann and Rouillier/Calhoun Tracts is attached to this opinion as Appendix 1.[8]
Ancestor in Common
The parties agree their respective chains of title trace back to common ancestors in title, the Hampton sisters, who subdivided White Hall Plantation. The first relevant transfer occurred on November 6, 1874, when the Hampton sisters sold a tract of land to Michel Bergeron, the ancestor in title to Rouillier and Calhoun. The Hampton sisters sold Michel Bergeron a portion of White Hall Plantation extending from the Mississippi River to the 40 arpent line. This sale did not include any double concession lands.
Approximately a month later, the Andermann Tract was created when the Hampton sisters sold property to Melford Webre, Andermann and St. James' ancestor in title, on December 19, 1874. The property description in the act of sale stated as follows:
1. A tract of land being a portion of a larger tract of land or plantation, commonly known as the White Hall Plantation, situated in the Parish of St. James, left bank of the Mississippi River, at about sixty-eight miles above the City of New Orleans, measuring one arpent and a half front on said river, by a depth of forty arpents, running between lines closing in the rear in the same degree as the main tract of White Hall Plantation, together with the buildings, fences and other improvements and all servitudes and rights of drainage there to belonging, which said tract of land is composed of the lower half of Lot No. 10 and Lot No. 11 on a plat of subdivision of said White Hall Plantation, and is bounded above by the lands of Michel Bergeron, and below by other lands of the present vendors, which said tract is sold with full warranty of title in law, and free from all encumbrances and evictions of any nature whatsoever.
2. All the rights, titles and pretentions of his said constituents, in and to the double concession lands, beginning at forty arpents from the river, to the rear, in the rear of the front or riparian tract, herein above first described, and belonging to said tract in the proportion of the whole double concession lands claimed by vendors to the main tract of White Hall Plantation, which said claims or titles to said double concession lands, *393 are presently sold without any warranty of title whatsoever. [Emphasis added.]
Pursuant to this property description, the front 40 arpents of Melford Webre's property was contiguous to the land purchased by Michel Bergeron, as it was described as "bounded above by the lands of Michel Bergeron." However, unlike the sale to Michel Bergeron, the sale to Melford Webre included the double concession lands.
In 1883, Michel Bergeron acquired the double concession lands contiguous and adjacent to Melford Webre's double concession lands. The Sale with Mortgage that Michel Bergeron entered into with the Hampton sisters on April 13, 1883, described the property as follows:
[A]ll the Rights, titles and pretentions of his aforenamed constituents in and to that portion of the Double concession lands of the White Hall Plantation, situated in the rear of and adjoining the property of the present purchaser, which is itself a portion of said White Hall Plantation, and situated in the Parish of St. James, measuring one arpent front on the left bank of the Mississippi River, at about Sixty Eight miles above the City of New Orleans, bounded above by lands of Aristide Louviere and below by lands of Melford Webre, which titles and pretentions to said double concession are sold without warranty of titles whatever. [Emphasis added.][9]
Andermann Tract Partition
The Andermann Tract originally acquired by Melford Webre remained intact as a single piece of property until Andermann and St. James partitioned it in 2007. Prior to that time, a Sheriff's deed recorded March 17, 1910, transferred Melford Webre's property to A.B. Vegas using the following property description:
A certain tract of land, situated in the Parish of St. James, on the Left bank of the mississippi river (sic), at about 67 miles above the City of New Orleans, measuring One arpent and a half front, on said river by Forty arpents in depth, bounded above by the property of the late Michel Bergeron and below by that of Eugene Webre, together with all buildings and improvements thereon and thereto belonging and all the rights, titles and pretentions of the Misses Hampton in and to the double concession lands, beginning at the Forty arpent line in the rear. [Emphasis added.]
This legal description is employed throughout the remainder of the chain of title relating to the Andermann Tract. By instrument recorded on June 18, 1910, Vegas sold the property to Emile and Sam Andermann, and Sam sold his interests in the property to Emile several months later in October 1910, using the same property description quoted above.
Roy Andermann eventually acquired a fifty-five percent (55%) undivided interest in the Andermann Tract through an inheritance from his father and by acquiring the interests of other Andermann heirs. St. James owned the tract of land downriver from the Andermann Tract and became Andermann's co-owner by acquiring a forty-five percent (45%) interest in the Andermann Tract from other Andermann heirs. The property descriptions in the *394 various conveyances to Andermann and St. James continued to describe the Andermann Tract as bounded above by the property of the late Michel Bergeron, Rouillier and Calhoun's ancestor in title.
Following its decision to install a 23-mile pipeline in St. James Parish in late 2006, UCAR's representative, Stephen LeBlanc, approached Andermann about obtaining a right of way over the Andermann Tract. Andermann did not tell his co-owner, St. James, about UCAR's proposal. Instead, he commenced efforts to partition and subdivide the Andermann Tract and obtain sole ownership of the upriver portion of the tract (Tract A) where UCAR proposed to lay the pipeline.
After St. James agreed to the partition, Andermann hired Alvin Fairburn to prepare a survey to partition the Andermann Tract. Instead of having Fairburn conduct an independent survey, Andermann attempted to expedite the process and save money by providing Fairburn with the Dornier Survey. Andermann asked Fairburn to simply retrace the Dornier Survey and subdivide the Andermann Tract into three separate tracts, A, B and C.
Fairburn confirmed that in preparing the 2007 Fairburn Survey, he did nothing more than retrace the Dornier Survey and did not review title documents or refer to recorded surveys contained in the Andermann/St. James chain of title or the titles of the adjoining property owners, Rouillier and Calhoun. According to the Dornier Survey, the gap tract is included in the Rouillier/Calhoun Tract. Andermann and St. James' President, Paul Morton, both testified that they intended to partition all of the property that they co-owned in the Act of Partition. However, they contend they did not realize the Fairburn and Dornier Surveys omitted the three-acre gap tract and, as discussed more fully below, they claim they still own the gap tract indivision as an unpartitioned portion of their property.
On March 29, 2007, Andermann and St. James recorded the Act of Partition and the referenced 2007 Fairburn Survey into the conveyance records. Pursuant to the Act of Partition, Andermann solely owns Tracts A and C, which the 2007 Fairburn Survey indicated were adjacent and contiguous to the Rouillier/Calhoun Tract. St. James owns Tract B, which is downriver from Tract A. The property description in the Act of Partition uses courses and distances descriptions to establish the property lines, and no longer includes language indicating Tracts A or C are "bounded above" by the Rouillier/Calhoun Tract.
Andermann provided a copy of the 2007 Fairburn Survey to Stephen LeBlanc for UCAR's use in preparing a survey plat for the pipeline servitude. Andermann granted the servitude to UCAR on January 5, 2008, and received over $ 360,000 from UCAR in return. The pipeline servitude recorded in the conveyance records on August 25, 2008, attached a survey plat based on the 2007 Fairburn Survey.
After UCAR began constructing the pipeline and Andermann and St. James learned about the gap tract, Andermann filed a trespass lawsuit against UCAR on December 22, 2009, and filed this boundary action on January 14, 2010. Later in 2011, Andermann and St. James jointly filed an Act of Declaration in the St. James Parish conveyance records asserting ownership indivision to the gap tract.
Rouillier/Calhoun Chain of Title
As explained above, Michel Bergeron acquired the current Rouillier/Calhoun Tract through several transactions. When Michel Bergeron purchased the double concession lands at issue in this matter, the property description indicated the tract was bounded *395 below by the lands of Melford Webre, the Andermann/St. James ancestor in title.
This changed in a subsequent cash sale from the heirs of Christophe Roussel to Pierre Emile Poche, recorded in the St. James Parish conveyance records on April 7, 1943, by describing the property by using a metes and bounds and survey description. ("1943 Cash Sale"). As cited below, the property description continued to utilize the bounded below language in the prior conveyances in the chain of title:
That portion of ground, together with all the buildings and improvements thereon, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of St. James, State of Louisiana, on the east bank of the Mississippi River, at about 68 miles above the City of New Orleans, measuring one arpent front on said river by forty arpents deep closing in proportion to the side lines of White Hall Plantation, with a double concession, bounded above by Villere Louviere and Dorado Louviere and below by Emile Andermann , Beginning at the point A shown on plan of survey made by H. E. Landry, C.E., dated December 2, 1942 , the ... [Emphasis added.]
Based on this description, the Rouillier/Calhoun Tract was now defined by a survey completed by H.E. Landry dated December 2, 1942 ("Landry Survey"), which was attached and recorded with the 1943 Cash Sale. Ancestors in the chain of title for the Rouillier/Calhoun property utilized this same property description consistently in subsequent transfers, including the March 17, 2000 sale by which Rouillier and Calhoun acquired the property.[10] The parties agree the Landry Survey indicates the gap tract is not included as part of Rouillier and Calhoun's property.
With respect to the pipeline servitudes Rouillier and Calhoun granted to UCAR in 2008, UCAR's landman, Stephen Leblanc, also approached them about providing a right of way for UCAR's pipeline along the rear portion of their property closer to Highway 3125. Rouillier signed his pipeline servitude in favor of UCAR on March 4, 2008, and Calhoun on May 23, 2008. The property description in the pipeline servitudes refers to the description in the 1943 Cash Sale. As explained above, UCAR's surveyor prepared the survey plats using the 2007 Fairburn Survey provided by Andermann. Therefore, according to these plats, as the pipeline approaches Highway 3125, it crosses from Andermann's property (Tract A) onto the gap tract which is indicated as Rouillier and Calhoun's property. UCAR recorded the servitudes in the St. James Parish conveyance records on December 29, 2008.
As discussed more fully below, Andermann and St. James contest whether Rouillier and Calhoun granted a servitude to UCAR over the gap tract because the property description contained in their UCAR pipeline servitudes references the 1943 Cash Sale, and that conveyance attaches the Landry Survey, which does not include the gap tract. Rouillier/UCAR contend Rouillier and Calhoun intended to grant a servitude over all of the property indicated in the survey plats attached to their servitudes and that these plats included the gap tract within their property. They note that UCAR's surveyor, Glen Miller, created the plats attached to the UCAR pipeline servitudes using the 2007 *396 Fairburn Survey commissioned by Andermann, which included the gap tract as part of Rouillier and Calhoun's property.
STANDARD OF REVIEW
Andermann and St. James filed separate appeals and raise assignments of error challenging both factual decisions and the legal standard utilized by the trial court in rendering its decision to establish the boundary between the parties' properties. The location of a boundary is a question of fact to be determined by the trier of fact and this factual determination should not be reversed on appeal in the absence of manifest error. Morris v. Sigur , 584 So.2d 729, 730 (La. App. 4th Cir.), writ denied , 589 So.2d 1054 (La. 1991). A court of appeal may not set aside the trial court's findings of fact, in the absence of manifest error or unless the findings are clearly wrong. Rosell v. ESCO , 549 So.2d 840, 844 (La. 1989). The Louisiana Supreme Court set forth a two-part test for the reversal of a fact finder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court or jury, and (2) the appellate court must further determine that the record establishes the finding is clearly wrong or manifestly erroneous. Stobart v. State through DOTD , 617 So.2d 880, 882 (La. 1993) ; Mart v. Hill , 505 So.2d 1120, 1127 (La. 1987).
This dictates that a reviewing court must do more than simply review the record for some evidence which supports the finding of the trial court or jury. The reviewing court must review the record in its entirety to determine whether the trial court's or jury's finding was "manifestly erroneous" or "clearly wrong." Stobart , 617 So.2d at 882. Furthermore, the reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. Id. at 882-83.
Questions of law are reviewed de novo without deference to the legal conclusions of the trial court. Power v. State Farm Fire and Cas. Co. , 15-796 (La. App. 5 Cir. 5/26/16), 193 So.3d 471, 473. When legal error interdicts the fact-finding process, the manifest error standard is no longer applicable and the appellate court should make its own independent do novo review of the record. Ferrell v. Fireman's Fund Ins. Co. , 94-1252 (La. 2/20/95), 650 So.2d 742, 747.
BURDEN OF PROOF TO ESTABLISH OWNERSHIP BY TITLE
As explained above, Andermann alleged the boundary should be set to include the gap tract within his property line because he and St. James can establish ownership of the gap tract by means of their title and acquisitive prescription. The primary assignment of error presented by both Andermann and St. James on appeal is that the trial court applied the wrong burden of proof in determining whether they could prove title to the gap tract. Rouillier/UCAR argued, and the trial court agreed, that because Andermann and St. James claimed ownership to the gap tract, the Louisiana Supreme Court's decision in Pure Oil v. Skinner , 294 So.2d 797, 798-99 (La. 1974), required them to prove "title good against the world," that is without referring to any surveys or property descriptions in the Rouillier/Calhoun chain of title. Andermann and St. James contend that by applying this burden, the trial court rendered it impossible for them to establish the boundary by title because the only defining upriver boundary included in their property descriptions is the language *397 indicating their property is bounded above by the lands of Michel Bergeron, the Rouillier/Calhoun ancestor in title.
Andermann and St. James further dispute Rouillier/UCAR's position that ownership of the gap tract is at issue and ask this Court to apply the divided burden of proof generally applied in boundary actions. See Russell v. Producers' Oil, 143 La. 217, 78 So. 473, 475 (1918) ; Roy v. Belt , 03-1022 (La. App. 3 Cir. 2/18/04), 868 So.2d 209, 213, writ denied , 04-1149 (La. 7/2/04), 877 So.2d 147. Andermann and St. James contend that under this lesser burden of proof, the trial court should have compared the property descriptions in both parties' chains of titles and used the Landry Survey contained in the Rouillier/Calhoun chain of title to set the boundary.
Burden of Proof in Boundary Actions
The Louisiana Civil Code sets forth the standard used to judicially fix a boundary between contiguous properties when the parties cannot reach an agreement. First, La. C.C. art. 792 provides that the court shall fix the boundary according to the ownership of the parties. To prove ownership, parties can rely on their titles ( La. C.C. art. 793 ) or acquisitive prescription ( La. C.C. art. 794 ). If both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author, preference shall be given to the more ancient title. La. C.C. art. 793. If neither party proves ownership over the disputed property, the boundary shall be fixed according to limits established by possession. La. C.C. art. 792. La. C.C.P. art. 3693 provides that "[a]fter considering the evidence, including the testimony and exhibits of a surveyor or other expert appointed by the court or by a party, the court shall render judgment fixing the boundary between the contiguous lands in accordance with the ownership or possession of the parties."
As outlined above, the Louisiana Civil Code sets forth several different methods to determine a boundary. Unfortunately, the provisions cited above do not contain explicit instructions on how to establish a boundary when one side (Rouillier and Calhoun) claims possession of a disputed tract but cannot prove acquisitive prescription, and the other side (Andermann and St. James) claims ownership of the property according to their title.[11] Andermann and St. James' main argument at trial was that after comparing each side's chain of title, the trial court should find they possessed better title to the gap tract and set the boundary pursuant to the Landry Survey contained in the Rouillier/Calhoun chain of title.
Therefore, Andermann and St. James contend the trial court incorrectly applied the burden of proof for petitory actions set forth in Pure Oil v. Skinner , 294 So.2d 797, 798-99 (La. 1974), and further erred by precluding them from relying on the Landry Survey in the Rouillier/Calhoun chain of title to establish their title to the gap tract. Andermann and St. James also deny that Rouillier and Calhoun were in possession of the gap tract at the time Andermann filed the boundary action, and further dispute that they raised issues involving ownership of the gap tract.
Rouillier and Calhoun argue that they are in possession of the gap tract and this matter involves issues of ownership of the *398 gap tract. Therefore, the trial court did not err as a matter of law by applying the higher burden of proof set forth in Pure Oil . Rouillier and Calhoun contend that as possessors of the gap tract, they are the presumed owners, see La. C.C. art. 3423,[12] and this presumption can only be rebutted by Andermann and St. James' proof of ownership of the gap tract by establishing "title good against the world" as required in Pure Oil .
First, we find Andermann and St. James' assertion that the parties raised no ownership issues with respect to the gap tract disingenuous. The voluminous record in this matter reveals the primary focus of the trial proceedings was establishing ownership of the gap tract through analysis of the parties' respective chains of title. Furthermore, Andermann alleged ownership by means of acquisitive prescription in his petition to fix the boundary. Accordingly, as discussed more fully below, we find that we must look to La. C.C.P. art. 3654, which the Supreme Court analyzed in Pure Oil , to determine the proper burden of proof to apply in this boundary action.
Pure Oil and La. C.C.P. art. 3654
Andermann and St. James contend the trial court erred by applying the burden of proof applicable to petitory actions to this boundary action. The applicable burden for petitory actions depends on whether the defendant is in possession of the disputed property. La. C.C.P. art. 3653(1) provides that if the defendant is in possession, the plaintiff must prove he acquired ownership from a previous owner or by acquisitive prescription.[13] Louisiana courts have interpreted this provision to mean the plaintiff must prove title good against the world without reference to surveys or property descriptions in the defendant's chain of title. Whitley v. Texaco, Inc. , 434 So.2d 96, 102 (La. App. 5th Cir. 1982), writ denied , 435 So.2d 445 (La. 1983). La. C.C.P. art. 3653(2) provides that when the defendant is not in possession, the plaintiff need only prove better title than the defendant.[14]
While the Pure Oil decision addressed the burden of proof for petitory actions, the Louisiana Supreme Court actually focused its analysis on La. C.C.P. art. 3654, which establishes similar burdens of proof for real actions, such as an action for declaratory judgment, or a concursus, expropriation or similar proceeding, when those proceedings involve issues of ownership of immovable property. 294 So.2d at 798-99. The plaintiff in Pure Oil filed a concursus proceeding, depositing into the *399 registry of the court royalties and naming as defendants, the Simontons and the Skinners, who both claimed ownership of the land to which the royalties were attributable. The ownership dispute involved one and a half acres of land which the Simontons had possessed for over one year. The Skinners had record title to the disputed property, but there was a 16-year gap in their chain of title from 1854 to 1874.
The Louisiana Supreme Court indicated that the parties must look to La. C.C.P. art. 3654 to determine the burden of proof the Skinners must satisfy to prevail in the concursus proceeding. Id. At the time of the Pure Oil decision, this provision provided that the court shall render judgment in favor of the party:
(1) Who would be entitled to the possession of the immovable property or real right in a possessory action, unless the adverse party makes out his title thereto; or
(2) Who proves better title to the immovable property or real right, when neither party would be entitled to the possession of the immovable property or real right in a possessory action.
The Pure Oil court concluded that the language "makes out his title thereto" in La. C.C.P. art. 3654(1) required a burden higher than the "better title" language in Section 3654(2).[15] Therefore, the Louisiana Supreme Court declared that because the Simontons were in possession of the disputed property, the Skinners were required "to show title good against the world without regard to the title of the party in possession." Id. at 799. Since a gap of 16 years existed in the Skinners' chain of title, and they had not proved ownership by acquisitive prescription, the court determined the Skinners failed to sustain their burden of proof. Id.
In 1981, Acts 1981, No. 256, § 1 amended La. C.C.P. arts. 3653 and 3654 to codify the burden of proof set forth in Pure Oil, supra. See Whitley, 434 So.2d at 102 ; Weaver v. Hailey , 416 So.2d 311, 315-318 (La. App. 3rd Cir. 1982) ; Symeon Symeonides, Developments in the Law, 1982-1983, Property , 44 La. L.R. 505, 510, fn. 32 (1983). As a result, the Legislature amended the language, "makes out his title thereto" to "proves that he has acquired ownership from a previous owner or by acquisitive prescription." Therefore, the current version of La. C.C.P. art. 3654 provides as follows:
When the issue of ownership of immovable property or of a real right is presented in an action for a declaratory judgment, or in a concursus, expropriation, or similar proceeding, or the issue of the ownership of funds deposited in the registry of the court and which belong to the owner of the immovable property or of the real right is so presented, the court shall render judgment in favor of the party:
(1) Who would be entitled to the possession of the immovable property or real right in a possessory action, unless the adverse party proves that he has acquired ownership from a previous owner or by acquisitive prescription; or
(2) Who proves better title to the immovable property or real right therein, when neither party would be entitled to the possession of the immovable property or real right therein in a possessory action.
Legal scholars agree that when ownership of a strip of land adjoining the land of a neighbor is at issue in a boundary action, *400 the court must look to the burden of proof set forth in La. C.C.P. art. 3654. See Frank L. Maraist, 1A Louisiana Civil Law Treatise, Civil Procedure - Special Proceedings , § 9.5, fn. 7; 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise, Property , § 11:31. Professor Maraist explains in his treatise that in boundary actions, "both of the parties' titles may include the same land, or a party may have possessed land beyond that described in his or her title . In such a case, the boundary action also determines ownership. " [Emphasis added] Id. at § 9.5. Under those circumstances, La. C.C.P. art. 3654 applies to determine the proper burden of proof. Id. at fn. 7; see also Symeon Symeonides, Ruminations on Real Actions , 51 La. L.R. 493, 512-516 (1991).
Furthermore, in Taylor v. Dumas , 48,055 (La. App. 2 Cir. 5/15/13), 115 So.3d 755, 758, writ denied , (La. 11/1/13), 125 So.3d 432, the Second Circuit recently applied the burden of proof set forth in La. C.C. art. 3654 to a boundary dispute involving issues of ownership and possession of the adverse party:
The legal concepts of ownership and possession expressed in these articles for the boundary action produce the same effects as in other real actions. The relationship between a party in possession and the adverse party claiming ownership and the applicable burden of proof are the same for the boundary action which is a specific proceeding within the title of the Code of Civil Procedure for real actions. See Book VII, Title II, Chapter 2 of the Louisiana Code of Civil Procedure. First, Civil Code Article 3423 elevates the party in possession in a real action, as follows:
A possessor is considered provisionally as owner of the thing he possesses until the right of the true owner is established.
This principle shifts the burden of proof to the adverse party who is not in possession but claiming ownership. That burden for the boundary and other real actions is best expressed in Article 3654 of the Code of Civil Procedure, in pertinent part, as follows:
[T]he court shall render judgment in favor of the party:
(1) Who would be entitled to the possession of the immovable property or real right therein in a possessory action, unless the adverse party proves that he has acquired ownership from a previous owner or by acquisitive prescription.
* * *
Thus, under the effects of the above principles reflected in Civil Code Article 792 and La. C.C.P. art. 3654, Taylor had the burden of proving her ownership to the Disputed Tract as acquired either from (1) a previous owner or (2) through her own acquisitive prescription by her actual possession extending before the time of the New Fence.
See also Sellers v. Barthelemy , 520 So.2d 1219, 1222 (La. App 5th Cir. 1988), where this Court applied the Pure Oil burden of proof in a boundary action involving ownership and possession issues.
Based on the foregoing, we find the trial court did not err by applying the burden of proof set forth in Pure Oil to resolve the issue of ownership by title in this matter. However, we note that in its written reasons, the trial court did not address the issue of possession in the context of the burden required to prove ownership by means of the parties' titles to the gap tract. As outlined above, possession determines whether the plaintiff is required to prove title good against the world or simply better title. See *401 Mt. Everett African Methodist Episcopal Church v. Carter , 96-2591 (La. App. 1 Cir. 12/29/97), 705 So.2d 1179, 1181. Accordingly, in order to determine whether the trial court applied the appropriate burden of proof, we must first consider the issue of whether Rouillier and Calhoun acquired the right to possess the gap tract before Andermann filed this boundary action.
POSSESSION
To determine Andermann and St. James' burden of proof with respect to ownership of the gap tract by means of their title, the first issue we must address is whether Rouillier and Calhoun would be "entitled to the possession of the immovable property or real right therein in a possessory action" as set forth in La. C.C.P. art. 3654. In other words, could they have maintained a possessory action? If the answer is affirmative, then Andermann and St. James are required to prove their title without reference to the Landry Survey in the Rouillier/Calhoun chain of title.
In its written reasons, the trial court determined Rouillier and Calhoun acquired the right of possession by two different means: 1) their own corporeal possession or personal activities on the gap tract, and 2) by precarious possession through UCAR's corporeal possession of the gap tract. With respect to their own corporeal possession, the trial court found that Rouillier and Calhoun lived on the property and routinely rode horses over the property. On the issue of precarious possession, the trial court reasoned that UCAR operated its pipeline in the gap tract on behalf of Rouillier and Calhoun for over a year with no disturbance of possession. The trial court specifically noted the survey plat that UCAR attached to the pipeline servitudes depicted possession north of the line established in the 2007 Fairburn Survey. It further noted that UCAR recorded the pipeline servitudes in the St. James Parish conveyance records on December 29, 2008, and Andermann did not file this boundary action until 2010. The trial court further reasoned that UCAR's acts of corporeal possession on the gap tract were open and obvious to all earlier in 2008, and noted Andermann and St. James' President, Paul Morton, testified that they were aware of clearing of trees and leveling of crops by UCAR in the gap tract starting in August or September 2008.
On appeal, Andermann and St. James argue the trial court committed factual and legal errors by determining Rouillier and Calhoun acquired the right of possession by means of their own corporeal possession. They also argue the trial court erred by ruling the pipeline servitudes allowed UCAR to precariously possess the gap tract on behalf of Rouillier and Calhoun. Andermann and St. James claim the property descriptions in the servitudes indicate Rouillier and Calhoun's intent to only grant the servitudes over the property described in the Landry Survey, which excluded the gap tract. They argue that legally, one can only grant a servitude over property which he or she owns. Andermann and St. James further contend the survey plats UCAR prepared based on the 2007 Fairburn Survey are incorrect, and were not finalized until well after Rouillier and Calhoun signed their pipeline servitudes.
Law of Possession and Right to Possess
"Possession is the detention or enjoyment of a corporeal thing, movable or immovable, that one holds or exercises by himself or by another who keeps or exercises it in his name." La. C.C. art. 3421. "Possession is a matter of fact; nevertheless, one who has possessed a thing for over a year acquires the right to possess it." La. C.C. art. 3422. Louisiana legislation and well-settled jurisprudence distinguish between possession, which is the exercise *402 of physical control over a thing with the intent to own it, and the right to possess, which one may acquire by exercising such authority for over a year. See 1982 Official Revision Comment (b) to La. C.C. art. 3422. "A possessor is considered provisionally as owner of the thing he possesses until the right of the true owner is established." La. C.C. art. 3423.
"To acquire possession, one must intend to possess as owner and must take corporeal possession." La. C.C. art. 3424. It is presumed that one who takes corporeal possession of a thing intends to possess as owner. See 1982 Official Revision Comment (b) to La. C.C. art. 3424. "Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing." La. C.C. art. 3425.
In order to be successful in a possessory action, one must prove he or she has been in uninterrupted possession for one year and has acquired the right to possess. La. C.C. art. 3422 ; La. C.C.P. art. 3658. A "possessor" is one who is in possession, regardless of how long that possession has lasted. If one exercises possession over the property for a year, he or she acquires the "right to possess." See Frank L. Maraist, 1A Louisiana Civil Law Treatise, Civil Procedure - Special Proceedings , § 9.2.
To maintain a possessory action, courts require the same kind of possession needed for 30-year acquisitive prescription. City of New Orleans v. New Orleans Canal, Inc. , 412 So.2d 975, 981 (La. 1982) ; Boneno v. Lasseigne , 589 So.2d 594, 596 (La. App. 5th Cir. 1991) ; Kadair v. Hampton , 13-1171 (La. App. 1 Cir. 7/10/14), 146 So.3d 694, 703, writ denied , 14-1709 (La. 11/7/14), 152 So.3d 177. Therefore, when the individual does not have title to the immovable property, his possession must be inch by inch or within enclosures. Boneno , 589 So.2d at 596. Enclosed does not necessarily mean fenced, but does require "that the land actually, physically and corporeally possessed by one as owner must be established with certainty, whether by natural or by artificial marks; that is, that they must be sufficient to give definite notice to the public and all the world of the character and extent of the possession, to identify fully the property possessed, and to fix with certainty the boundaries or limits thereof." Hill v. Richey , 221 La. 402, 59 So.2d 434 (1952) ; Boneno , 589 So.2d at 595. The possession must be open, continuous, public, unequivocal and uninterrupted with the intent to possess as owner. The intent to possess as owner cannot be inferred when the circumstances are insufficient to give reasonable notice to the public and the owner of the property that the possessor is unequivocally possessing as owner. City of New Orleans , 412 So.2d at 981-82. Isolated acts of a transitory nature are insufficient to establish possession. Boneno , 589 So.2d at 596.
Rouillier/Calhoun Corporeal Possession
With respect to Rouillier and Calhoun's personal corporeal possession of the gap tract, the trial court stated as follows in its written reasons:
Additionally, Rouillier/Calhoun actively possessed the gap tract continuously, without interruption, for many years, thus acquiring the right to possess said property. Ms. Calhoun testified that they lived on the property and had horses which they routinely rode over the property.
At trial, Calhoun explained that she is the daughter of Emile Poche, Sr., who purchased the Rouillier/Calhoun Tract in 1943. She testified that she grew up on the property and her brother, Jerry Poche, eventually acquired the Rouillier/Calhoun Tract. Calhoun and her ex-husband, Rouillier, leased the property from her brother in 1999 and then purchased the Rouillier/Calhoun *403 Tract in 2000. Calhoun testified that they owned horses and would ride horses on the property on a regular basis, including the area between the 40 and 80 arpent lines in the vicinity of Highway 3125. They also drove pickup trucks into this area of the property. Calhoun separated from Rouillier in November 2004 and moved off of the property.[16] She further testified that she had only been back to the property a few times since 2004. Because Calhoun ceased living on the property in 2004, and only visited the property on a few occasions thereafter, her activities are clearly insufficient to establish open and continuous corporeal possession of the gap tract at the time Andermann filed the boundary action.
Rouillier testified that he continued to reside on the Rouillier/Calhoun Tract following his divorce from Calhoun. He testified that he routinely rides his horses in the area between the 40 arpent line and Highway 3125. He also indicated that sometimes, he rode in the woods in the back of the property, depending on the time of year.
As explained above, Rouillier and Calhoun do not claim to possess title to the gap tract. Therefore, to establish that they acquired the right to possess the gap tract through their own corporeal possession, they were required to establish inch by inch possession of the gap tract. The extent of the testimony and evidence Rouillier and Calhoun offered with respect to their own corporeal possession of the gap tract was Rouillier routinely riding his horses in the area between the 40 arpent line and Highway 3125. However, the gap tract is only a small part of this area. Rouillier and Calhoun provided no testimony or evidence to establish Rouillier's open and continuous possession of the disputed gap tract area. To the extent the trial court determined the testimony from Rouillier and Calhoun qualified to establish inch by inch possession of the gap tract, such a conclusion was manifestly erroneous. Therefore, the trial court erred to the extent it concluded Rouillier and Calhoun acquired the right to possess the gap tract through their own acts of corporeal possession.
UCAR Precarious Possession
We next address the trial court's finding that Rouillier and Calhoun acquired the right to possess the gap tract through UCAR's precarious possession. The trial court stated in its written reasons that Rouillier and Calhoun "acted as possessors by granting a pipeline servitude to UCAR in 2008 and permitting UCAR to construct its pipeline across the gap [tract]."
Andermann and St. James raise several assignments of error with respect to the trial court's findings on UCAR's precarious possession. They first argue the right to grant a servitude belongs solely to the owner of the property and no one can transfer a greater right than he has himself. See Woodland Properties, L.L.C. v. New Orleans Sewerage and Water Board , 10-331 (La. App. 4 Cir. 9/29/10), 49 So.3d 443, 445 ; La. C.C. art. 697.[17] They contend Rouillier and Calhoun could not grant UCAR a servitude outside of their title, which is limited to the Landry Survey.
*404 Andermann and St. James further contend the trial court erred by finding Rouillier and Calhoun intended to grant a pipeline servitude to UCAR over the gap tract because the property descriptions in their pipeline servitudes refer to the 1943 Cash Sale and they both testified that they did not intend to grant a servitude beyond their title. Finally, Andermann and St. James claim error on the basis that UCAR did not possess the gap tract for one year and acquire the right to possess before Andermann filed a trespass action against UCAR on December 22, 2009.
Precarious Possession Granted by a Possessor
While Andermann and St. James correctly state that Louisiana law provides owners are the proper parties to grant servitudes on their property, as detailed below, Louisiana law also recognizes that a non-owner or "possessor" can acquire the right of possession by granting a servitude or other real right on immovable property pursuant to the concept of precarious possession. While one who establishes himself as the owner of the property may ultimately be able to challenge the validity of the servitude, this does not prohibit a possessor, who has no record title, from acquiring possession by granting a right of way or other servitude to a precarious possessor. See Chauvin v. Shell Oil Company , 16-609 (La. App. 5 Cir. 10/25/17), 231 So.3d 903, 911, writ denied , 17-1985 (La. 1/29/18), 233 So.3d 607 ; Seven Water Holes Corp. v. Spires , 393 So.2d 811, 814 (La. App. 2nd Cir.), writ denied , 399 So.2d 610 (La. 1981).
Possession is defined in La. C.C. art. 3421 as the detention or enjoyment of an immovable, "that one holds or exercises by himself or another who keeps or exercises it in his name." La. C.C. art. 3428 further explains that one may acquire possession through another person:
One may acquire possession of a thing through another who takes it for him and in his name. The person taking possession must intend to do so for another.
The 1982 Official Revision Comment to La. C.C. art 3428 explains that "[w]hen one acquires possession for another and in the name of another, his possession is precarious."
In addition, La. C.C. art. 3429 provides that a possessor may also allow another person to possess on his or her behalf:
Possession may be exercised by the possessor or by another who holds the thing for him or in his name.
One who possesses on behalf of another is a precarious possessor. See 1982 Official Revision Comment (b) to La. C.C. art. 3429.
La. C.C. art. 3437 defines "precarious possession" as the "exercise of possession over a thing with the permission of or on behalf of the owner or possessor ." [Emphasis added.] Though acquisitive prescription does not run in favor of a precarious possessor, it can run in favor of the owner or possessor on whose behalf the precarious possessor possesses. Chauvin , 231 So.3d at 911 ; Seven Water Holes Corp. , 393 So.2d at 814.
In Chauvin , supra , this Court considered a similar issue involving precarious possession. In the context of an acquisitive prescription issue, this Court recognized a defendant could acquire possession of a tract of land by granting pipeline servitudes to third parties acting as precarious possessors. 231 So.3d at 910-911. Chauvin involved a dispute over ownership of a tract of land. Defendant, Shell Oil Company, argued that it purchased the disputed tract from plaintiffs' ancestors in title and granted pipeline servitudes over the disputed tract to other companies that remained in place for over *405 30 years. Plaintiffs argued in opposition that their ancestors did not intend to sell the disputed tract and therefore, they remained owners.
The trial court granted summary judgment in favor of Shell Oil and found the plaintiffs' ancestors in title intended to sell the disputed tract to Shell Oil. Id. at 910. This Court affirmed the trial court's decision and further found that even if Shell Oil did not acquire the property from the plaintiff's ancestors in title, it acquired ownership of the disputed tract by means of acquisitive prescription. Id. at 912. In reaching this conclusion, this Court reasoned that Shell Oil acquired possession, and ultimately ownership, through 30 years of precarious possession by its pipeline servitude grantees:
Shell Oil has possessed the property for a period of more than thirty years, when it first granted a pipeline servitude over the property in 1980 and continued to grant several others over the next thirty-two years before its title to the property was challenged in 2012. Shell Oil's possession of the property has been exercised through the precarious possession of the servitude grantees. Precarious possession is the exercise of possession over a thing with the permission of or on behalf of the owner or possessor. La. C.C. art. 3437. Though acquisitive prescription does not run in favor of a precarious possessor, La. C.C. art. 3477, it can run in favor of the owner or possessor on whose behalf the precarious possessor possesses, see 1982 Official Revision Comment (b) of La. C.C. art. 3428 ("[O]ne who has taken possession of a servitude has the quasi-possession of the servitude for himself and the possession of the land for the owner."). [Emphasis added.]
Id. at 911.
Furthermore, in Seven Water Holes , supra , the Second Circuit determined that even when a possessor has not actually taken corporeal possession of property himself, he can acquire possession and ultimately ownership through the precarious possession of another person. 393 So.2d at 814-15. In that case, the record title holder of a tract of land filed a petitory action to be recognized as owner of the property. The adverse claimants argued that they acquired ownership of the disputed property by granting leases and other rights of use to third parties over a 30-year period. The Second Circuit affirmed the trial court's judgment recognizing the adverse claimants acquired ownership of the disputed tract by 30-year acquisitive prescription through a succession of tenants who held the property on behalf of the adverse claimants. Id. at 814-15. The appellate court further found that precarious possession accrued in favor of the adverse claimants even though they never initially took corporeal possession of the disputed property. Id. at 814.
Based on the foregoing, we reject Andermann and St. James' argument that Rouillier and Calhoun could not grant the pipeline servitudes and acquire the right to possess even though their title through the Landry Survey did not include the gap tract.
Rouillier and Calhoun Intended to Grant a Servitude Over the Gap Tract
Andermann and St. James next argue against precarious possession claiming the property descriptions contained in the pipeline servitudes, as well as testimony from Rouillier and Calhoun, establish they did not intend to grant UCAR a right of way over the gap tract, and therefore, did not intend to possess the gap tract as *406 owners.[18]
In support of this argument, Andermann and St. James first point to the property descriptions included in the UCAR pipeline servitudes and note that they refer to the 1943 Cash Sale. They argue this conveyance incorporates and attaches the Landry Survey, which indicates the gap tract is not included in the Rouillier/Calhoun Tract. At the same time, Andermann and St. James recognize the survey plats attached to the pipeline servitudes were prepared by UCAR using the 2007 Fairburn Survey, and contradict the property descriptions because they include the gap tract as part of Rouillier and Calhoun's property. Andermann and St. James contend, however, that the survey plats are wrong based on testimony from Rouillier and Calhoun that they did not intend to grant UCAR any rights outside of their title.
Louisiana law provides that when a discrepancy exists between the property description in the document transferring title and the surveyor's plat attached to or referenced in the conveyance, the plat controls. Bernard v. Somme , 501 So.2d 893, 895 (La. App. 5th Cir. 1987) ; Barbera v. Midway Land Co., Inc. , 453 So.2d 645, 648 (La. App. 5th Cir.), writ denied , 460 So.2d 609 (La. 1984). Andermann and St. James respond to this rule by citing to Bourgeois v. Linden Interest , 11-1130 (La. App. 3 Cir. 2/1/12), 84 So.3d 715, which held that this general rule does not apply when it is obvious the survey plat is wrong.
In Bourgeois , a dispute arose regarding the boundary between two properties previously partitioned by the owners. The act of partition described the boundary as the centerline of a road between the properties. The attached survey depicted the road as a straight line, but both owners agreed the road was not a straight line. The trial court found that the survey prevailed over the language in the act of partition and set the boundary as a straight line. The appellate court reversed finding the survey should not prevail when it is obviously incorrect. Id. at 719-720.
The issue before this Court is different than the undisputed inaccuracy in the Bourgeois survey. Andermann and St. James do not point to an inaccuracy in the survey plats prepared by UCAR, but rather argue that based on their testimony, Rouillier and Calhoun only intended to grant UCAR a right of way on the property described in their title. We must start our analysis of this issue with the presumption set forth in the Louisiana Civil Code and jurisprudence that when one possesses an immovable, he is presumed to intend to possess as an owner. La. C.C. 3423 ; Todd v. State, Through Dept. of Natural Resources , 474 So.2d 430, 437 (La. 1985). Physical possession by a non-owner is sufficient notice to the record owner and the public at large that a non-owner intends to possess the property for himself, as owner. Chevron U.S.A., Inc. v. Landry , 558 So.2d 242, 244 (La. 3/12/90).
As explained above, Andermann and St. James point to testimony from Rouillier and Calhoun on cross-examination agreeing that they intended to grant UCAR the servitude in accordance with their title and therefore, argue they could not have intended to grant the servitude over the gap tract. However, Rouillier also testified that he observed the work, including clearing of trees and digging trenches, UCAR was conducting in the area of the gap tract near Highway 3125. He further testified *407 that he believed UCAR was working on his property in accordance with the servitude he granted to them. Calhoun also testified that after she granted the pipeline servitude to UCAR, she noticed heavy equipment on the gap tract near Highway 3125 and saw UCAR clearing trees. She further testified that at the time she granted UCAR the servitude, she believed she owned the property depicted in the servitude plat and had the full right and authority to grant UCAR permission to build the pipeline in that area. She explained she had no reason to suspect the boundary line indicated on the servitude plat was inaccurate because it was the same line depicted on the survey plat attached to the servitude Andermann granted to UCAR.
Andermann also questioned Rouillier and Calhoun's intentions based on the fact the survey plats attached to their UCAR servitudes were dated September 29, 2008, several months after they signed their agreements in March and May 2008. UCAR's surveyor, Glen Miller, testified that prior to preparing the final version of the survey plat attached to the pipeline servitudes, he prepared preliminary plats, which UCAR provided to the landowners. Miller created all of these plats using the 2007 Fairburn Survey, indicating Rouillier and Calhoun owned the gap tract. Calhoun confirmed that UCAR provided her with a preliminary plat prior to the time she signed the pipeline servitude in favor of UCAR. She further testified that the preliminary plat appeared to be similar to the September 29, 2008 plat attached to the servitude recorded in the conveyance records. We further note that Andermann and St. James' President, Paul Morton, both testified they were aware UCAR used the 2007 Fairburn Survey attached to their Act of Partition to create the survey plats attached to the UCAR pipeline servitudes.
Based on the foregoing, we cannot find that the trial court was manifestly erroneous in upholding the presumption outlined above and determining that Rouillier and Calhoun intended to possess the gap tract as owners through UCAR's precarious possession.
Rouillier and Calhoun Acquired the Right to Possess the Gap Tract Through One Year of Uninterrupted Possession
In the final issue relating to precarious possession, Andermann argues the trial court erred in finding Rouillier and Calhoun acquired the right to possess through one year of uninterrupted possession of the gap tract. Andermann notes that in its written reasons, the trial court identified two pertinent dates with respect to the right to possess: December 29, 2008 - the date UCAR recorded the pipeline servitudes in the conveyance records, and January 14, 2010 - the date Andermann filed this boundary action. Andermann contends the trial court failed to consider the trespass suit he filed against UCAR on December 22, 2009, less than a year prior to the accrual of the right to possess.
However, in addition to identifying the date of recordation of the pipeline servitudes, the trial court also determined that "UCAR's acts of corporeal possession on the gap tract were open and obvious to all in 2008." The trial court noted that both Andermann and St. James acknowledged that UCAR began clearing trees and leveling crops in the gap tract in August or September 2008. This activity caused Andermann and St. James to become concerned as to who actually owned the property. Both Andermann and St. James acknowledged they received copies of the survey plats indicating the location of the pipeline on the Rouillier/Calhoun Tract prior to December 2008. On December 2, 2008, St. James, through its president, Morton, made a detailed presentation *408 to UCAR explaining its belief that the survey plats generated by Miller using the 2007 Fairburn Survey were incorrect.
Clearly, the trial court determined that based on these facts, UCAR's open and obvious possession of the gap tract commenced as early as August 2008. Accordingly, we find that trial court was not manifestly erroneous in determining that Rouillier and Calhoun acquired the right to possess the gap tract though one year of undisturbed possession of the gap tract by UCAR.
THE TRIAL COURT WAS NOT MANIFESTLY ERRONEOUS BY FINDING ANDERMANN AND ST. JAMES COULD NOT ESTABLISH TITLE GOOD AGAINST THE WORLD TO THE GAP TRACT
Based on our determination that the trial court did not commit any legal or factual errors in its conclusion that Rouillier and Calhoun acquired the right to possess the gap tract, we further find the trial court did not commit legal error by requiring them to establish title to the gap tract pursuant to the heightened burden of proof required by La. C.C.P. art 3654 - establishing title good against the world without reference to the surveys and property descriptions in the Rouillier/Calhoun chain of title. Andermann and St. James contend, however, that even if this heightened burden applies, they still can establish title to the gap tract based on the "bounded by" language contained in their chain of title.
The Trial Court Did Not Abuse Its Discretion By Excluding Testimony From Andermann and St. James' Proposed Title Examination Expert
Before we address the issues related to Andermann and St. James' title to the gap tract, we first address St. James' assignment of error asserting the trial court abused its discretion by refusing to allow testimony from their proposed title examination expert, Peter Title. Rouillier/UCAR objected to Title's expert testimony on the grounds that as an attorney, he was simply offering legal advice to the trial court on Louisiana property law. The trial court sustained their objection to Title's testimony and concluded it was capable of interpreting the parties' relevant title documents without the assistance of a title examination expert.
In determining whether to admit expert testimony, the court is guided by two primary concerns: whether the witness plans to testify to actual technical knowledge and whether such knowledge will assist the trier of fact in understanding the relevant issues. Pelts & Skins Export, Ltd. v. State ex rel. Dep't of Wildlife and Fisheries , 97-2300 (La. App. 1 Cir. 4/1/99), 735 So.2d 116, 121, writs denied , 99-2036 and 2042 (La. 10/29/99), 748 So.2d 1167 and 1168. The appellate court, absent a clear abuse of the trial court's discretion, will not disturb a trial court's decision to exclude expert testimony. Gonzalez v. Government Employees Ins. Co. , 09-140 (La. App. 5 Cir. 2/9/10), 32 So.3d 919, 927.
Title is a licensed attorney and licensed title insurance agent with over 20 years of title examination experience, including title opinions determining boundary locations based on the property descriptions contained in title documents. St. James asserts that they offered Title's testimony to assist the trial court in interpreting the "arcane and rarely-used terminology" contained in the various instruments in the parties' chains of title dating back to 1869. St. James further explains that Title provided specialized knowledge regarding the "calls, double concession lands, and adjoiners, the effect and interpretation of surveys filed in the chains of *409 title, and the weight and effect on title that is customarily given to different instruments by title examiners."
In his proffered testimony, Title methodically reviewed the property descriptions in the parties' title documents and explained how a property owner with a property description limited to "bounded above and bounded below" language could establish the location of his boundaries by referring to the property descriptions in the adjoining landowner's chain of title.
Our review of the record in this matter indicates that the judge who tried this matter possessed a detailed understanding of the property descriptions contained in the parties' title documents. The written reasons provided by the judge who rendered judgment in this matter also exhibit the same detailed understanding. We further note that Andermann and St. James' expert surveyors also expressed the same opinions as Title regarding the need to refer to the adjoining landowner's chain of title when the property description is limited to "bounded by" language. For these reasons, we do not find the trial court abused its discretion by excluding Title's testimony as unnecessary to assist the trier of fact in understanding the title documents and their effect on determining the location of the boundary.
The Trial Court Did Not Err By Determining Andermann and St. James Could Not Establish Title to the Gap Tract
To set the boundary according to Andermann and St. James' title in this matter, the law requires them to establish title to the gap tract without reference to the property descriptions and survey contained in the Rouillier/Calhoun chain of title. In its written reasons, the trial court reviewed the expert testimony and the Andermann chain of title and determined that calls contained in the 1874 conveyance from the Hampton sisters to Melford Webre, Andermann and St. James' ancestor in title, indicated the original boundary lines were proportionate lines established in accordance with a proration or proportion method. The trial court further recognized the boundary lines contained in the 2007 Fairburn Survey, the only survey contained in the Andermann chain of title, satisfied these calls for proration or proportion.
Andermann and St. James choose not to address these findings and instead argue it was inappropriate for the trial court to limit them to their own chain of title because the "bounded above and below" language in their property description prohibits them from proving the boundaries of their property without referring to the title from the adjoining landowner. They contend that prior to the Act of Partition, the Andermann Tract was consistently described in their chain of title by the phrase: "bounded above by the property of the late Michael Bergeron," the Rouillier/Calhoun ancestor in title.[19] Though Andermann and St. James admit the Act of Partition indicated their intent to partition all of the property in the Andermann Tract, they contend they did not know the partition omitted the gap tract. They explain the inadvertent omission of the gap tract occurred as a result of their reliance on the incorrect 1978 Dornier Survey, which Andermann provided to Fairburn to retrace. Accordingly, Andermann and St. James contend the property lying between *410 the upriver boundary of Tract A owned by Andermann after the partition, and the boundary established by the Landry Survey, remained unpartitioned and co-owned indivision by them.
Andermann and St. James further argue the trial court erred by disregarding the testimony of their surveyors who explained that due to the "bounded by" language contained in the Andermann chain of title, the only solution to establish the boundary is to refer to the Rouillier/Calhoun chain of title and to set the boundary according to the Landry Survey. They note Fairburn testified that his 2007 survey was incorrect because he did not conduct an abstract of the Rouillier/Calhoun chain of title. Fairburn explained that he simply retraced the 1978 Dornier Survey in accordance with the instructions he received from Andermann. Andermann and St. James further argue both of their surveyors testified that they believed the Dornier Survey was inaccurate due to the existence of the Landry Survey contained in the Rouillier/Calhoun chain of title, which sets the boundary on the ground.
The trial court heard testimony from three expert surveyors - Alvin Fairburn and Anthony Cavell for Andermann and St. James, and David Patterson on behalf of Rouillier/UCAR. All three surveyors agreed that they could locate the markers for both the Landry Survey and the 2007 Fairburn Survey on the ground, and that they were both valid surveys. They all agreed the Landry Survey is not referenced anywhere in the Andermann chain of title. They also agreed that the northern boundary of the 2007 Fairburn Survey and the southern boundary of the Landry Survey between the 40 arpent line and the 80 arpent line are inconsistent. When compared, they agreed the surveys reveal a three-acre triangular shaped gap that increases in width as the lines approach the 80 arpent line.
Rouillier/UCAR's expert, David Patterson, testified that in analyzing how to solve the dilemma of the gap created by these surveys, he discovered that the original intent of individuals who divided White Hall Plantation was to make 26 equal lots. Patterson explained that while he could not locate a subdivision plat of White Hall Plantation, he located a survey of White Hall Plantation completed by Guy Seghers in 1937. The Historical Data contained in this survey indicated that White Hall Plantation was subdivided "into 26 lots with side lines closing or converging in the rear in the same degree as the main tract of Whitehall Plantation." The survey further provided that each lot was 81.67 feet at the 40 arpent line. Based on these findings, Patterson determined that it would be appropriate to apply a proportion or proration method.
Patterson further noted the italicized language below in the 1874 sale by the Hampton sisters to Melford Webre, Andermann and St. James' ancestor in title that called for proration or proportion in establishing the upriver and downriver property lines of the Andermann Tract:
1. A tract of land being a portion of a larger tract of land or plantation, commonly known as the White Hall Plantation, situated in the Parish of St. James, left bank of the Mississippi River, at about sixty-eight miles above the City of New Orleans, measuring one arpent and a half front on said river, by a depth of forty arpents, running between lines closing in the rear in the same degree as the main tract of White Hall Plantation , together with the buildings, fences and other improvements and all servitudes and rights of drainage there to belonging, which said tract of land is composed of the lower half of Lot No. 10 *411 and Lot No. 11 on a plat of subdivision of said White Hall Plantation, and is bounded above by the lands of Michel Bergeron, and below by other lands of the present vendors, which said tract is sold with full warranty of title in law, and free from all encumbrances and restrictions of any nature whatsoever.
2. All the rights, titles and pretentions of his said constituents, in and to the double concession lands , beginning at forty arpents from the river, to the rear, in the rear of the front or riparian tract, herein above first described, and belonging to said tract in the proportion of the whole double concession lands claimed by vendors to the main tract of White Hall Plantation , which said claims or titles to said double concession lands, are presently sold without any warranty of title whatsoever. [Emphasis added.]
Andermann and St. James' expert, Anthony Cavell, agreed these calls indicated a reference to proration or proportion of the property lines.
Patterson testified that he reconstructed the property lines of the Andermann Tract using the proration or proportion method and was able to locate a line between the two properties at issue that was within 13 inches of the line established by the 2007 Fairburn Survey at the 40 arpent line and within 5 inches at the 80 arpent line. Again, Cavell agreed that the 2007 Fairburn Survey (retracing the Dornier Survey) established property lines based on the proportion or proration method.
The trial court obviously rejected the testimony from Andermann and St. James' experts contending it was necessary to refer to the Rouillier/Calhoun chain of title in order to determine the boundaries of Andermann and St. James' property prior to the Act of Partition, and therefore, rejected the argument that their title included the gap tract. In light of the historical information identified by Rouillier/UCAR's expert, and the calls for proration or proportion contained in the Andermann chain of title, we cannot find the trial court was manifestly erroneous in determining Andermann and St. James could not establish title to the gap tract.
ANDERMANN FAILED TO PRESENT ADEQUATE EVIDENCE TO PROVE OWNERSHIP OF THE GAP TRACT THROUGH ACQUISITIVE PRESCRIPTION
If a party cannot establish ownership through their title, they can also establish ownership of the disputed property in a boundary action by proving ownership of the property through acquisitive prescription. La. C.C. art. 794. Andermann argues that he and St. James acquired ownership of the gap tract because Andermann and other ancestors in title granted a servitude to Exxon to install and operate a pipeline on the gap tract in 1997. He further argues Exxon used the Landry Survey to create the plat attached to the servitude the Andermann heirs granted to Exxon. Andermann argues that by means of Exxon's precarious possession, they acquired ownership of the gap tract by possessing the gap tract for a period in excess of ten years in good faith and with just title. Rouillier/UCAR argue in response that the record does not contain evidence to support Andermann's arguments that the Exxon servitude is contained in the gap tract or that Exxon used the Landry Survey to create the servitude.
Andermann devotes a large portion of his briefing to the Exxon servitude granted in 1997. Rouillier provided the only testimony regarding the location of the Exxon pipeline servitude during his cross-examination. He indicated that it was located somewhere in the back of his property. However, his testimony is unclear as to *412 the exact location of the servitude and does not prove whether the Exxon servitude is located in the gap tract.
Q. Ever heard of an Exxon Pipeline?
A. Yeah, I heard of that.
Q. Do you know where that one is, generally speaking?
A. Roughly.
Q. Where?
A. It's across the back of the property, toward the back of the property.
Q. On the opposite side of 3125, away from the river?
A. Yes. Well, yeah. On this side of 3125, Yes.
Q. We'll call that north.
A. Yeah.
Q. Is that a fair statement?
A. I don't know what the directions would be in that area, because the river takes all kinds of turns.
Neither Andermann nor his experts provided any testimony regarding the exact location of the Exxon servitude. Furthermore, Andermann did not call a representative from Exxon to testify regarding the pipeline servitude. After extensive review of the property descriptions and survey plats attached to the Exxon servitude agreements granted by the Andermann heirs, this Court is unable to determine whether the Exxon pipeline servitude is located in the gap tract. Furthermore, the servitude agreements do not indicate the survey maps were created from the Landry Survey. Andermann argues that the February 9, 2011 survey completed by UCAR's surveyor includes information regarding the location of the Exxon pipeline.[20] However, after extensive review of this survey, this Court is unable to identify the location of the Exxon servitude.
It is unfortunate the trial court could not ultimately locate an expert to assist in interpreting the information contained in the numerous surveys introduced into evidence. It was not for lack of effort, as the record indicates the trial court searched for over a three-year period for an eligible surveyor to assist it in analyzing the complex boundary and title issues presented in this case. Further efforts to secure an eligible surveyor would have been futile. Furthermore, Andermann had more than ample opportunity to elicit and present testimony and evidence from his own experts regarding the Exxon servitude during the trial of this matter.
Therefore, the trial court was not manifestly erroneous in its determination that Andermann failed to present evidence to prove his claims regarding acquisitive prescription.
THE TRIAL COURT'S DECISION TO SET THE BOUNDARY IN ACCORDANCE WITH THE LINE DEPICTED IN THE 2007 FAIRBURN SURVEY WAS NOT MANIFESTLY ERRONEOUS.
As Andermann and St. James could not establish ownership of the gap tract by title or acquisitive prescription, we must establish the boundary line by looking to the parties' possession of the gap tract. Based on our extensive analysis set forth above, we find that Rouillier and Calhoun acquired the right to possess the gap tract through UCAR's precarious possession. Andermann, on the other hand, failed to prove precarious possession of the gap tract through the Exxon servitude and failed to present evidence of any other corporeal possession of the gap tract by Andermann and St. James with the intent to possess that property as owner. Accordingly, because we find that Rouillier and *413 Calhoun possessed the gap tract up to the line established in the 2007 Fairburn Survey by means of the pipeline servitude they granted to UCAR, we find that the trial court correctly set the boundary at the line between the Andermann Tract and the Rouillier/Calhoun Tract as depicted in the 2007 Fairburn survey.
In his final assignment of error, Andermann argues the trial court failed to properly identify the 2007 Fairburn Survey used to establish the boundary in its September 20, 2017 Final Judgment. In this judgment, the trial court only refers to the "Fairburn survey." Andermann contends that three different surveys prepared by Fairburn, dated January 5, 2007, May 22, 2009 and August 10, 2011, were introduced into evidence. He further argues that La. C.C. art. 1919 provides that all judgments which affect title to immovable property shall describe the immovable property affected with particularity.
It is apparent from the trial court's written reasons that it intended to set the boundary in accordance with Fairburn's January 5, 2007 Survey attached to Andermann and St. James' Act of Partition. However, written reasons are not part of the judgment. Wempren v. St. James Parish School Bd. , 15-709 (La. App 5 Cir. 5/12/16), 193 So.3d 349, 354. Therefore, we agree with Andermann that the trial court must amend its September 20, 2017 Final Judgment to specify that it is setting the boundary between the Andermann Tract and the Rouillier/Calhoun Tract in accordance with the boundary depicted in the January 5, 2007 Fairburn Survey recorded in the St. James Parish conveyance records on March 29, 2007. We also instruct the trial court to attach a copy of this survey to its amended judgment.
DECREE
Based on the foregoing, we affirm the trial court's September 20, 2017 Final Judgment and remand this matter for the trial court to amend the judgment to identify the survey used to set the boundary in this matter in greater detail as instructed above.
AFFIRMED AND REMANDED TO AMEND JUDGMENT AS INSTRUCTED
Attachment *414 --------

Intervenor, UCAR Pipeline, Inc., is also an appellee in this matter. When this Court intends to refer to Rouillier, Calhoun and UCAR collectively as the appellees in this matter, this Court will refer to them as "Rouillier/UCAR."

According to Andermann, he obtained the Dornier Survey from his aunt. He explained that Felix Dornier completed the survey at the request of his uncle, Lawrence Andermann, but it was never used in the Andermann Tract chain of title and never recorded in the conveyance records. Andermann purchased his uncle's interests in the Andermann Tract in 2004.

Highway 3125 cuts across and divides the rear portion of the parties' properties.

La. C.C.P. art. 3692 permits the court to "appoint a surveyor to inspect the lands and to make plans in accordance with the prevailing standards and practices of his profession indicating the respective contentions of the parties.

While Judge Turner recused himself from the boundary issues, he continued to preside over a separate issue UCAR raised in its petition for intervention regarding the continued enforcement of its pipeline servitude. St. James filed a motion to recuse and after a hearing before another judge, Judge Turner was recused from the entire proceeding.

Eighty arpents is equivalent to 15,360 feet or almost three miles.

In Hero v. Friedrichs , 10 Teiss. 298, 1913 WL 1892 (La. App. Orleans 1913), the court explained that the term "double concession" originated from the right of preference which the French and Spanish governments, and afterwards the United States, accorded the owner of any tract of land bordering on a river, bayou or similar body of water. The usual depth of property bordering on such a body of water was 40 arpents. The double concession granted by the governments generally added an additional 40 arpents of land to the rear of the property for a total of 80 arpents. The double concession lands were usually swamps incapable of cultivation and inaccessible except by way of the front 40 arpents.

During his trial testimony, Patterson confirmed his survey maps misidentified the partitioned tracts contained within the Andermann Tract. The referenced map incorrectly notes that Tract B, instead of Tract A, is adjacent to the Rouillier/Calhoun Tract. Also, the tract on the opposite side of Highway 3125 on Inset A-A should be identified as Tract C instead of Tract B. We include an image of this map merely to provide an illustration of the location of the disputed gap tract.

By instrument recorded on February 16, 1881, Michel Bergeron acquired a second tract of riparian land from August Laurent and by an instrument recorded on April 16, 1888, he acquired additional double concession lands from Joseph Louviere that are included in the tract now owned by Rouillier and Calhoun. These properties are not contiguous to the Andermann Tract and are not relevant to the boundary issue before this Court.

Rouillier and Calhoun are divorced and are now co-owners in indivision of the Rouillier/Calhoun Tract.

Andermann also contends he can establish ownership through acquisitive prescription by means of a right of way he and his ancestors in title granted to Exxon to build a pipeline in 1997. However, as discussed more fully below, Andermann did not present sufficient evidence to determine where the Exxon pipeline is located and whether the rights of way contained in the Andermann/St. James chain of title granted a servitude on the gap tract.

La. C.C. art. 3423 provides that a "possessor is considered provisionally as owner of the thing he possesses until the right of the true owner is established."

La. C.C. art. 3653 provides in total as follows:
To obtain a judgment recognizing his ownership of immovable property or real right therein, the plaintiff in a petitory action shall:
(1) Prove that he has acquired ownership from a previous owner or by acquisitive prescription, if the court finds that the defendant is in possession thereof; or
(2) Prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof.
When the titles of the parties are traced to a common author, his is presumed to be the previous owner.

Furthermore, La. C.C. art. 531 provides that "[o]ne who claims the ownership of an immovable against another in possession must prove that he has acquired ownership from a previous owner or by acquisitive prescription. If neither party is in possession, he need only prove a better title." The 1979 Official Revision Comment (a) to La. C.C. art 531 provides that a "defendant is in possession when he and his ancestors in title have had corporeal possession for at least one year or civil possession for the same period of time preceded by corporeal possession."

At the time of the Pure Oil decision, La. C.C.P. art. 3653(1) also contained the same language requiring a plaintiff in a petitory action to "make out his title thereto" when the defendant was in possession of the disputed property.

Following her divorce from Rouillier, Calhoun owns a fifty percent (50%) interest in the Rouillier/Calhoun Tract and co-owns the property with him.

La. C.C. art. 697 provides that "[p]redial servitudes may be established by an owner on his estate or acquired for its benefit." La. C.C. art. 645 also provides that a "right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude."

As discussed above, to establish possession one must intend to possess as an owner. La. C.C. art. 3424.

Andermann and St. James explain that as a matter of established law, a "bounded by" property description is known as a description per aversionem . When property is purchased pursuant to a description per aversionem, the title to the estate embraces all property between the properties of the adjoining owners. Williamson v. Kelly , 520 So.2d 868, 871 (La. App. 3rd Cir. 1987), writ denied , 522 So.2d 562 (La. 1988).

This survey is attached to this opinion as Appendix 1.